*John T. Mitchell v. Maryland Motor Vehicle Administration*, No. 10, September Term, 2016. Opinion by Harrell, J.

**CONSTITUTIONAL LAW – GOVERNMENT SPEECH**

The First Amendment's Free Speech Clause limits permissible government restrictions of private speech, but it does not limit government speech. To differentiate government speech from private speech, a court evaluates three factors: whether the government has a history of speaking through the medium in question, whether the speech's audience would attribute the speech to the government, and the extent to which the government controls the medium and the speech conveyed through it.

**CONSTITUTIONAL LAW – PRIVATE SPEECH ON GOVERNMENT PROPERTY**

The Supreme Court's public forum doctrine determines the extent to which the government may restrict private speech on government property. Speech restrictions in a traditional public forum and a designated public forum are subject to strict scrutiny, whereas speech restrictions in a limited public forum and a nonpublic forum need only be reasonable and viewpoint neutral.

**CONSTITUTIONAL LAW – FIRST AMENDMENT – MOTOR VEHICLE VANITY LICENSE PLATE REGULATIONS**

State limitations on the characters that may appear on vanity license plates are evaluated for reasonableness and viewpoint neutrality. The relevant Maryland statute and regulation are valid under these standards. The recall by the Motor Vehicle Administration under these provisions of the vanity license plate issued to Petitioner, bearing the Spanish word "MIERDA," which means "shit" typically in English, is affirmed.

Circuit Court for Prince George's County
Case No. CAL-12-25266

Argued: September 7, 2016

IN THE COURT OF APPEALS
OF MARYLAND

No. 10

SEPTEMBER TERM, 2016

JOHN T. MITCHELL

v.

MARYLAND MOTOR VEHICLE
ADMINISTRATION

Barbera, C.J.,
Greene,
Adkins,
McDonald,
Watts,
Getty,
Harrell, Glenn T., Jr. (Retired,  Specially
Assigned),

JJ.

Opinion by Harrell, J.

Filed:      October 28, 2016

What does Petitioner, John T. Mitchell, have in common with "Seinfeld's" Cosmo Kramer? Both received and displayed on their respective motor vehicles, for a period of time, vanity license plates bearing words that had arguably scatological meanings.[1] Mitchell did not give up without a fight when the Maryland Motor Vehicle Administration (MVA) recalled his vanity plates; hence, this litigation.

The MVA granted in 2009 John T. Mitchell's application for vanity license plates bearing the word "MIERDA." Two years later, the MVA received a complaint[2] about "MIERDA" on the plates displayed on Mitchell's vehicle. The MVA determined then that "mierda" translates into English as "shit" and rescinded the plates according to a State regulation authorizing the denial or recall of vanity plates containing "profanities, epithets, or obscenities."

Mitchell pursued a series of challenges to the MVA's decision. An Administrative Law Judge (ALJ) of the Maryland Office of Administrative Hearings (OAH), the Circuit Court for Prince George's County, and the Court of Special Appeals of Maryland affirmed the MVA's actions. We granted Mitchell's petition for writ of certiorari. *Mitchell v. Maryland Motor Vehicle Admin.*, 447 Md. 297, 135 A.3d 416 (2016).

---

[1] In "Seinfeld" (Episode 107 (27 April 1995)), Kramer was sent erroneously vanity plates bearing the words "ASSMAN," which plates had been applied for by a proctologist. Mitchell applied for, and received from Maryland's Motor Vehicle Administration (MVA), vanity plates bearing the Spanish slang word "MIERDA." It was conceded in the present case that the primary sense of "MIERDA" in English means "shit," although there are other senses of "MIERDA," such as filth, dirt, compost, etc.

[2] The record does not contain a copy of the alleged complaint nor any identification of who was the complainant.

This case raises questions necessitating our assessment of the Supreme Court's First Amendment public forum doctrine, including, whether messages on vanity plates are government speech or private speech; whether vanity plates are a traditional public forum, designated public forum, limited public forum, or nonpublic forum; and, what standard of review applies to government restrictions of speech in the forum or fora applicable to the circumstances of this case. Although mindful that we risk being haunted by the spirit of the late comedian and social commentator George Carlin, we shall hold that: the characters or message on a vanity license plate represent private speech in a nonpublic forum, which requires government speech restrictions thereof to be reasonable and viewpoint neutral; Maryland's regulation prohibiting profanities, epithets, or obscenities satisfies this standard; and, the MVA acted to recall Mitchell's vanity plates reasonably and viewpoint-neutrally, in accordance with the regulation, and based on substantial evidence in the record. Thus, we affirm the judgment of the Court of Special Appeals.

## BACKGROUND

Maryland requires the obtention and display of registration plates on in-state registered motor vehicles. Md. Code, Transportation Art., § 13–411 (1977, 2012 Repl. Vol.). The plates must contain an individualized "registration number," consisting of "letters, numerals, or both," which is assigned typically by the MVA. § 13–410(b). For an additional annual fee of $50, an applicant may select a "special, personalized registration number," subject to the MVA's approval. § 13–613(a), (b), and (c). Known as "vanity plates," these plates allow the display of "a message with at least 2 and up to 7

2

characters," unless the chosen message "has already been issued or . . . is objectionable." Md. Motor Vehicle Admin., *Personalized (Vanity) License Plates,* Maryland.gov, http://www.mva.maryland.gov/vehicles/licenseplates/personalized-license-plates.htm [https://perma.cc/Y2CG-ZWF7]. Indeed, Maryland regulations empower the MVA to deny or rescind vanity plates whose messages bear "profanities, epithets, or obscenities." Code of Maryland Regulations (COMAR) 11.15.29.02(D).

The MVA offers also two options for customizing a license plate's general theme, which may, but need not, be combined with a vanity message. First, "background scene plates," or "commemorative plates," display images and text associated with issues the State wishes to promote through both its speech and fee revenue. Md. Motor Vehicle Admin., *Background Scene Plates*, Maryland.gov, http://www.mva.maryland.gov/vehicles/registration/background-plate.htm [https://perma.cc/8K7D-G5ZF]. Commemorative plates are available presently to support the Chesapeake Bay, § 13–618, COMAR 11.15.15.01(A), and agriculture, § 13–619.2, COMAR 11.15.30.01(A). Second, Maryland allows the customization of "specialty plates" for members of nonprofit organizations who pay a fee to express their organizations' messages via logos, emblems, the organization's name, or another combination of characters. § 13–619. The MVA sells specialty plates for a diverse range of issues from medical and military interests to educational institution alumni associations, and hobbies. Md. Motor Vehicle Admin., *Organizational*, Maryland.gov, http://www.mva.maryland.gov/vehicles/specialty-plates/organizational-sp.htm [https://perma.cc/Q5XV-7G89].

3

In 2009, Mitchell applied for vanity plates bearing the characters "MIERDA" on the agricultural commemorative plate template.[3]   With no apparent thought or reservation, the MVA approved the application and sent him the desired plates.  After displaying the plates for two years without challenge, Mitchell renewed them in June 2011.  The MVA claims to have received thereafter a complaint, in December 2011, alleging the inappropriateness of the use of "MIERDA" on Mitchell's plates.  Sharon Crow, manager of the MVA's Motor Carrier and Electronic Services Division, investigated (apparently for the first time) the nature of "mierda," using Wikipedia as her primary resource. Crow's "research" revealed that "mierda" is often regarded as a profanity in Spanish, and that in English it has as its primary meaning "shit," context aside.  "Shit" was (and remains, we are informed) a term on the MVA's ad-hoc "objectionable plate list" maintained by Crow's Division and used to screen prospective vanity license plate messages.

Relying on COMAR 11.15.29.02(D), the regulation authorizing the MVA to deny or rescind plates containing "profanities, epithets, or obscenities," the MVA informed Mitchell on 27 December 2011 of its decision to rescind and recall his "MIERDA" vanity plates.  Mitchell exercised his right to demand an administrative appeal under COMAR 11.15.29.05.  A hearing was held before an ALJ of the OAH on 23 April 2012.  Mitchell argued that "mierda" has a variety of non-profane and non-obscene meanings, and that

---

[3] Although Mitchell makes a passing argument that his use of "MIERDA" reflects support for organic farming, the parties concede that the use of a commemorative template for the vanity plate here is of no real moment to our analysis.

some of which, such as "compost," make sense in the context of the agricultural plate template and a rural lifestyle, although he conceded that it can also mean "shit." On 17 July 2012, the ALJ found dispositive "mierda's" offensive meaning, which, she ruled, justified the MVA's rescission of the plates under Md. Code, Transportation Art., § 13–613 and COMAR 11.15.29.02(D).

Following Mitchell's filing of a petition for judicial review, the Circuit Court for Prince George's County affirmed the ALJ's ruling, entering a spare order to that effect on 5 August 2013. The Court of Special Appeals affirmed, in a reported and thoughtful opinion, holding that vanity plates constitute a nonpublic forum for First Amendment purposes, and that the MVA's actions were reasonable and viewpoint neutral, thereby satisfying the Supreme Court's requirements on governmental restrictions of private speech. *Mitchell v. Maryland Motor Vehicle Admin.*, 225 Md. App. 529, 126 A.3d 165 (2015).

This Court granted Mitchell's Petition for a Writ of Certiorari, *Mitchell v. Maryland Motor Vehicle Admin.*, 447 Md. 297, 135 A.3d 416 (2016), to consider the following questions, paraphrased for clarity and brevity:[4]

---

[4] Mitchell's questions presented, in full, read as follows:
1. Did the Court of Special Appeals err in concluding that personalized vanity plates are a non-public forum in which motorists who pay the fee to express their 7-character message may be censored despite expressing otherwise constitutionally protected private speech?
2. Did the Court of Special Appeals err in choosing to censor a Spanish word based on the most offensive definition it could imagine, despite the existence of innocuous definitions of the term?

1. Did the Court of Special Appeals err in concluding that personalized vanity plates are a nonpublic forum?
2. Did the Court of Special Appeals err in upholding the MVA's restriction on Mitchell's speech?

## DISCUSSION

Mitchell's main contentions are that: i) "MIERDA" on vanity license plates constitutes private speech in a designated and/or limited public forum, and that either forum triggers strict scrutiny review of government regulation thereof; ii) regardless of the proper forum, the Maryland regulation fails even the lower standard of reasonable basis plus viewpoint neutrality; and iii) neither "mierda" nor "shit" are profane or obscene. The State answers that: i) "MIERDA" on a vanity plate is government speech, or, alternatively, private speech in a nonpublic forum; ii) the First Amendment does not limit restrictions on government speech or, if "MIERDA" is private speech in a nonpublic forum, the regulatory scheme in question is reasonable and viewpoint neutral; and iii) the MVA's rescission of Mitchell's plates was based on substantial evidence.

**I. Under the Supreme Court's articulation of the First Amendment Public Forum doctrine, the vanity plate message "MIERDA" constitutes private speech in a nonpublic forum, wherein government restrictions on speech must be reasonable and viewpoint neutral.**

**a. "MIERDA," in the relevant context, is private speech, not government speech.**

In its most recent case elucidating the distinction between private speech and government speech, the U.S. Supreme Court determined that a Texas-issued specialty license plate displaying a Confederate flag constituted speech by the government, not

6

speech by the Texas Division of the Sons of Confederate Veterans, the organization that sought the plate design. *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015). A court's identification of speech as either that of the government or of a private person or entity determines whether the First Amendment applies at all: "government statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas." *Walker*, 135 S. Ct. at 2245–46. The First Amendment protects, however, private speech on government property, with some limitations.

The Court used three factors to disambiguate government speech from private speech. *Walker*, 135 S. Ct. at 2247 (citing *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 470-73 (2009)). The Court considered first whether the government used historically the mechanism of communication in question "'to speak to the public.'" *Walker*, 135 S. Ct. at 2247 (quoting *Summum*, 555 U.S. at 470). Many States, including Texas, used specialty plate slogans for nearly a century "to urge action, to promote tourism, and to tout local industries." *Walker*, 135 S. Ct. at 2248. Second, the Court considered to whom the audience of the communications would tend reasonably to attribute the speech: a private speaker or the public owner of the property on which the speech takes place. *Walker*, 135 S. Ct. at 2247. Because of their well-understood "governmental purposes of vehicle registration and identification," the display of "TEXAS" on each plate, and the State's ownership of specialty plate designs, "Texas license plate designs 'are often closely identified in the public mind with the [State].'" *Walker*, 135 S. Ct. at 2248 (quoting *Summum*, 555 U.S. at 472). Finally, the Court

7

looked to whether the government exercises control over the communication, for example, by retaining "'final approval authority.'" *Walker*, 135 S. Ct. at 2247 (quoting *Summum*, 555 U.S. at 473). Texas had "direct control" over specialty plate messages, including "the design, typeface, color, and alphanumeric pattern for all license plates," as well as "final approval authority" over the content of a specialty plate design. *Walker*, 135 S. Ct. at 2249 (quotation marks omitted). "These considerations, taken together," persuaded the Court to find the specialty plates at issue to be government speech. *Id.*[5]

In the present case, the Court of Special Appeals reasoned correctly that a message on a vanity plate, such as "MIERDA," is private speech. Applying the Supreme Court's first analytical factor, historical usage, although license plates in general function historically as government IDs for vehicles, vanity plates display additionally "a personalized message with intrinsic meaning (sometimes clear, sometimes abstruse) that is independent of mere identification and specific to the owner." *Mitchell v. Maryland Motor Vehicle Admin.*, 225 Md. App. 529, 561, 126 A.3d 165, 184 (2015). The unique, personalized messages communicated via vanity plates contrast with the generic,

---

[5] In lieu of the Supreme Court's three-factor test used in *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015) and *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 470-73 (2009), Mitchell urges us to use the four-factor government speech test employed in *Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of Virginia Dep't of Motor Vehicles*, 288 F.3d 610 (4th Cir. 2002). The Fourth Circuit used this test only because, at the time that case was decided, the court recognized that "[n]o clear standard has yet been enunciated in our circuit or by the Supreme Court for determining when the government is 'speaking' and thus able to draw viewpoint-based distinctions, and when it is regulating private speech and thus unable to do so." 288 F.3d at 618. The U.S. Supreme Court has elucidated a test since then, so there is no reason to dwell further on Mitchell's suggestion.

8

depersonalized speech conveyed by a specialty plate: "[m]any Maryland vehicles display identical specialty plates; only the registration numbers, which on a specialty plate have no intrinsic meaning and carry no message, will vary." *Mitchell*, 225 Md. App. at 562, 126 A.3d at 184-85. Additionally, private citizens, not the State of Maryland, create and submit prospective vanity plate messages. "So, historically, vehicle owners have used vanity plates to communicate their own personal messages and the State has not used vanity plates to communicate any message at all. Unlike the license plate slogans that States use 'to urge action, to promote tourism, and to tout local industries[,]' vanity plates are personal to the vehicle owner, and are perceived as such." *Mitchell*, 225 Md. App. at 562, 126 A.3d at 185 (quoting *Walker*, 135 S. Ct. at 2248)).

Turning to the factor of audience perception, "[t]he personal nature of a vanity plate message makes it unlikely that members of the public, upon seeing the vanity plate, will think the message comes from the State." *Mitchell*, 225 Md. App. at 563, 126 A.3d at 185. Unlike the specialty plates at issue in *Walker*, vanity plates bear unique, personalized, user-created messages that cannot be attributed reasonably to the government. The fact that this kind of speech takes place on government property—a license plate—is not transformative in this context of private speech into government speech. *Id.* (citing *Walker*, 135 S. Ct. at 2242). Indeed, the Supreme Court's public forum doctrine, discussed *infra*, exists only because of the need to analyze government restrictions of private speech that takes place on government property. Nor does the

9

juxtaposition of private speech on government property transform the public perception of the speaker's identity.[6] Although perhaps the perception of a governmental imprimatur is what makes "MIERDA" arguably clever or humorous in the first place, this stems from the public perception of State permission of private speech, not State endorsement or State expression. A fellow motorist who understood the primary Spanish meaning or English translation of "mierda" might think: "the MVA let you get away with that?," or "you pulled a fast one on the MVA!" Even these sentiments are rooted in an understanding that the vehicle owner, not the government, is the speaker, and that the speaker implicated the State in a private message that, surprisingly, the government permitted, but certainly did not endorse.

Considering the third factor of the government speech analysis, the Court of Special Appeals concluded correctly that the MVA's statutory and regulatory authority to deny or rescind a vanity plate based on the content of its message, § 13–613(c)(2);

---

[6] The Court of Special Appeals articulated persuasively a routine, reasonable public reaction to observing a vanity plate:

> There is nothing governmental about the message "BOB" or "FROSTY" or "68VETT" or "LVMYDOG" or "B HAP E." And the natural reaction of those who see the "BOB" vanity plate will be to think that the driver of the vehicle is speaking and is saying, "Hey world, I'm Bob." Members of the public might assume, not unreasonably, that the "BOB" vanity plates would not be on the vehicle if the MVA had not allowed them to be issued. Given the plainly personal nature of vanity plate messages, however, people making that assumption would not next assume that "BOB" is a message spoken by the State. Indeed, they would **not** assume that the State has endorsed the message so as to make the message its own. At most, they would assume that the State had permitted the vehicle owner to display the ***owner's*** requested message on the vanity plate.

*Mitchell v. Maryland Motor Vehicle Admin.*, 225 Md. App. 529, 563-64, 126 A.3d 165, 185-86 (2015).

10

COMAR 11.15.29.02 and 11.15.07.01, does not rise to the level of "such tight control that the personalized messages become government speech." *Mitchell*, 225 Md. App. at 564, 126 A.3d at 186. Maryland does not exercise "direct control" over the "alphanumeric pattern" displayed on vanity plates in the same or similar way that Texas controlled specialty plates. *Walker*, 135 S. Ct. at 2249 (quotation marks omitted). In Texas, the State had "sole control" over the content of a specialty plate. *Id.* (quotation marks omitted). With respect to vanity plates in Maryland, "vehicle owners, not the State, create the proposed messages and apply for them." *Mitchell*, 225 Md. App. at 564, 126 A.3d at 186. Although the MVA retains discretion to deny a prospective vanity message, its authority to recall vanity plates (but not specialty plates) issued erroneously suggests that the MVA's control over vanity plates does not rise to the rigorous level required to transmogrify its regulatory approach into government speech. *Id.*

Contrarily, a recent ruling by the Indiana Supreme Court held that vanity plates constitute government speech because "[l]icense plates have long been used for government purposes" such as vehicle identification, their messages are perceived to be communicated on behalf of the State, and the State "'maintains direct control'" over the messages they display. *Comm'r of Indiana Bureau of Motor Vehicles v. Vawter*, 45 N.E.3d 1200, 1204-06 (Ind. 2015), *cert. denied sub nom. Vawter v. Abernathy*, 136 S. Ct. 2011 (2016) (quoting *Walker*, 135 S. Ct. at 2249). Like the Court of Special Appeals, *Mitchell*, 225 Md. App. at 565–67, 126 A.3d at 186–87, we reject the *Vawter* court's reasoning because vanity plates represent more than an extension *by degree* of the government speech found on regular license plates and specialty plates. Vanity plates

11

are, instead, fundamentally different *in kind* from the aforementioned plate formats. Maryland has not communicated historically to the public with vanity messages. Observers of vanity plates understand reasonably that the messages come from vehicle owners. Moreover, the MVA does not exercise control over vanity plate messages to the extent that *Walker* informs us Texas controlled specialty plates.

> **b. Vanity plates, as a medium for private speech, are a nonpublic forum that trigger reasonable basis and viewpoint neutrality review of the relevant regulatory scheme.**

> > **i. "For we now see [private speech on government property] through [the public forum doctrine], darkly."[7]**

As noted earlier in this opinion, *Walker* represents the Supreme Court's most recent expression of its public forum doctrine jurisprudence, which the Court uses "to evaluate government restrictions on purely private speech that occurs on government property." *Walker*, 135 S. Ct. at 2250 (citing *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.,* 473 U.S. 788, 800 (1985)). *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) reduced the then-extant Supreme Court First Amendment forum jurisprudence into three distinct categories: the traditional public forum, the designated public forum, and the nonpublic forum. 460 U.S. at 45-46. In a footnote clarifying ostensibly the nature of the designated public forum, the Court hinted at an

---

[7] 1 *Corinthians* 13:12 (King James Version, describing the obfuscating pall cast over one's perception of reality by an unclear glass or mirror: "For we now see through a glass, darkly."). As discussed *infra*, the Supreme Court's explanations of the public forum doctrine over the historical course of its relevant jurisprudence lack some clarity and consistency.

additional possible category, the limited public forum, which subsequent court opinions

continue to define incongruously, assuming they acknowledge its existence at all. *Perry*

*Educ. Ass'n*, 460 U.S. at 46 n.7.[8]

The traditional public forum encompasses "places which by long tradition or by

government fiat have been devoted to assembly and debate." *Perry Educ. Ass'n*, 460 U.S.

at 45. Exemplified quintessentially by the public street or the public park, such fora

"'ha[ve] immemorially been held in trust for the use of the public and, time out of mind,

ha[ve] been used for purposes of assembly, communicating thoughts between citizens,

and discussing public questions.'" *Walker*, 135 S. Ct. at 2250 (quoting *Perry Educ.*

*Ass'n*, 460 U.S. at 45-46). "[A]ny restriction based on the content of the speech must

satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a

compelling government interest . . . and restrictions based on viewpoint are prohibited."

*Summum*, 555 U.S. at 469 (citing *Cornelius*, 473 U.S. at 800, and *Carey v. Brown,* 447

U.S. 455, 463 (1980)).

The designated public forum "exists where 'government property that has not

traditionally been regarded as a public forum is intentionally opened up for that

---

[8] Sometimes, the Supreme Court seemed to believe that there was only one middle forum. The *Rosenberger* Court developed the limited public forum jurisprudence, but it did not acknowledge the existence of the designated public forum. *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819 (1995). Contrariwise, the *Forbes* Court discussed the designated public forum at length, without acknowledging the existence of the limited public forum. *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998). We are unable to divine the Supreme Court's intent in occasionally disregarding, without explication, one category of forum or another. *See infra* n.13 for similar reactions from scholars and other courts.

purpose.'" *Walker*, 135 S. Ct. at 2250 (quoting *Summum*, 555 U.S. at 469). Whereas a traditional public forum gains its forum status through "objective characteristics of the property," such as a history of use as a public forum, "[d]esignated public fora, in contrast, are created by purposeful governmental action." *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998). The fundamental trait of a designated public forum is that it is "generally available to a class of speakers." *Forbes*, 523 U.S. at 678 (citation and quotation marks omitted). Perhaps counterintuitively, although the Court reiterated that the designated public forum is "generally available," "generally open," and allows "general access," the forum is available, open, and accessible only to the particular class of speakers for whom the forum was originally opened, not to the public at large. *Forbes*, 523 U.S. at 678-79. This should not be confused with "selective access," which the Court identified as a hallmark of the nonpublic forum. *Forbes*, 523 U.S. at 679.[9] With respect to judicial review, "[g]overnment restrictions on speech in a

---

[9] Differentiating general access from selective access in this way, as the Supreme Court has, raises several perplexing issues. First, the designated public forum itself is a form of selective access, because, according to the *Forbes* Court, it is open only to a select class of speakers. Second, the *Forbes* opinion does not acknowledge the existence of the limited public forum (even though the Eighth Circuit characterized explicitly the forum in question as a limited public forum, *Forbes v. Arkansas Educ. Television Comm'n*, 93 F.3d 497 (8th Cir. 1996)). In defining the designated public forum with language that parallels uncannily the Supreme Court's prior definition of the limited public forum, it is unclear whether the Court conflated intentionally these fora. Third, it is not perfectly clear how "selective" access to a nonpublic forum differs from the "limited" access to a limited public forum. We shall not dwell further on these imponderables because achieving clarity on these points is not our job nor necessary to our analysis in the present case.

designated public forum are subject to the same strict scrutiny as restrictions in a traditional public forum." *Summum*, 555 U.S. at 469-70.

The limited public forum "exists where a government has 'reserv[ed a forum] for certain groups or for the discussion of certain topics.'" *Walker*, 135 S. Ct. at 2250 (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 829 (1995)). As foreshadowed *supra*, the ephemeral limited public forum eludes consistent treatment by the Court. In *Perry Educ. Ass'n*, the Court added a footnote to the end of the sentence defining the designated public forum, which stated: "[a] public forum may be created for a limited purpose such as use by certain groups or for the discussion of certain subjects." 460 U.S. at 46 n.7 (citations omitted). Given the similarity between the text of this footnote and the definition of the designated public forum, perhaps the *Perry Educ. Ass'n* Court intended the limited public forum to be a variant of the designated public forum, rather than its own category.[10] The *Rosenberger* Court, however, cut the umbilical cord tethering the limited public forum to the designated public forum, discussing the former as a distinct classification: "[t]he necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics. Once it has opened a limited forum, however, the State must respect the lawful boundaries it has itself set." 515 U.S. at 829

---

[10] Indeed, in *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) [hereinafter *ISKCON*], the Supreme Court referred only to a single middle forum, the designated public forum, but noted that it could be "of a limited or unlimited character." In subsequent opinions, the Court appears to jettison this formulation.

(citations omitted). Quoting the same language from *Rosenberger*, the *Walker* Court maintained the severance of the limited public forum from the designated public forum in its brief characterization of each as separate categories in the forum analysis. 135 S. Ct. at 2250.

Despite the definitional similarities between the designated public forum and the limited public forum, and notwithstanding the Court of Special Appeals's statement to the contrary,[11] the Supreme Court has been clear that government restrictions on speech in a limited public forum "must be reasonable and viewpoint neutral." *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 679 (2010) ("Recognizing a State's right 'to preserve the property under its control for the use to which it is lawfully dedicated, the Court has permitted restrictions on access to a limited public forum . . . with this key caveat: Any access barrier must be reasonable and viewpoint neutral.") (quotation marks and citations omitted); *Summum*, 555 U.S. at 470 ("The Court has also held that a government entity may create a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects. In such a

---

[11] "Because in the case of a designated public forum and a limited public forum, the government intentionally has created a forum for free expression by members of the public, regulation of speech in those fora, like regulation of speech in a traditional public forum, must satisfy the strict scrutiny standard." *Mitchell*, 225 Md. App. at 549, 126 A.3d at 177 (citing *Perry v. McDonald*, 280 F.3d 159, 166 (2d Cir. 2001) [hereinafter *McDonald*, to avoid confusion with *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983)]). In *McDonald*, however, the Second Circuit stated that "[r]estrictions on speech in a designated public forum are . . . subject to strict scrutiny," *id.*, and in a footnote appended to this sentence, it stated that "[g]overnment restrictions on speech in a limited public forum need only be reasonable and viewpoint-neutral." *McDonald*, 280 F.3d at 166 n.4.

16

forum, a government entity may impose restrictions on speech that are reasonable and viewpoint neutral.") (citations omitted).[12]

The nonpublic forum "exists '[w]here the government is acting as a proprietor, managing its internal operations.'" *Walker*, 135 S. Ct. at 2251 (quoting *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678-79 (1992) [hereinafter *ISKCON*]). It consists of "[p]ublic property which is not by tradition or designation a forum for public communication." *Perry Educ. Ass'n*, 460 U.S. at 46. "Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property." *Perry Educ. Ass'n*, 460 U.S. at

---

[12] Mitchell argues that strict scrutiny applies to government restrictions of speech in a limited public forum, citing *Sons of Confederate Veterans, Inc. v. Glendening*, 954 F. Supp. 1099, 1102 (D. Md. 1997). Indeed, this case states that "[t]he government's regulation of speech in both the traditional and limited or designated public fora is subject to strict scrutiny." *Id.* (citing *United States v. Kokinda,* 497 U.S. 720, 726–27 (1990)). The Supreme Court, however, has clarified repeatedly, both before 1997 and subsequently, that the standard of review relative to regulation in the limited public forum is reasonableness plus viewpoint neutrality. *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 679 (2010); *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 470 (2009); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001) ("When the State establishes a limited public forum . . . [t]he State's power to restrict speech . . . is not without limits. The restriction must not discriminate against speech on the basis of viewpoint, and the restriction must be 'reasonable in light of the purpose served by the forum.'") (citations omitted); *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995) ("Once it has opened a limited forum, . . . the State must respect the lawful boundaries it has itself set. The State may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum,' nor may it discriminate against speech on the basis of its viewpoint.") (citations omitted).

49. Examples of nonpublic fora include airport terminals, *ISKCON*; a publicly televised debate between political candidates, *Forbes*; an interschool mail system, *Perry Educ. Ass'n*; and a charity drive held in a government workplace, *Cornelius*. As for judicial review scrutiny, government restrictions of speech in a nonpublic forum must be reasonable and viewpoint neutral. *Cornelius*, 473 U.S. at 800 ("Access to a nonpublic forum . . . can be restricted as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" (quoting *Perry Educ. Ass'n*, 460 U.S. at 46)).

The *Walker* opinion glossed over the Supreme Court's jurisprudential inconsistencies that plague the public forum doctrine, presenting instead a snapshot of four seemingly distinct analytical models without addressing the confusion that has permeated courts' opinions across the land, percolating for decades.[13] Regardless, under

---

[13] *See, e.g., United Food & Commercial Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 750 (6th Cir. 2004) ("Our circuit and others have noted the confusion surrounding the use of the terms 'designated public forum' and 'limited public forum.'"); *Goulart v. Meadows*, 345 F.3d 239, 249 (4th Cir. 2003) ("There is some confusion over the terminology used to describe this third category [the designated public forum], as the Supreme Court and lower courts have also used the term 'limited public forum.'"); *Hopper v. City of Pasco*, 241 F.3d 1067, 1074 (9th Cir. 2001) ("The designated public forum has been the source of much confusion."); *DeBoer v. Vill. of Oak Park*, 267 F.3d 558, 566 (7th Cir. 2001) (noting the "analytical ambiguity" resulting from the Supreme Court's initial treatment of the limited public forum as a subcategory of the designated public forum subject to strict scrutiny, and its subsequent treatment as an independent forum subject to reasonable basis review and viewpoint neutrality); *Fighting Finest v. Bratton*, 95 F.3d 224, 229 (2d Cir. 1996) ("The Supreme Court has sent somewhat mixed signals as to the criteria for identifying a 'limited' public forum."); Lyrissa Lidsky, *Public Forum 2.0*, 91 B.U. L. REV. 1975, 1976 (2011) (discussing "the U.S. Supreme Court's public forum and government speech doctrines, both of which are lacking in

(Continued…)

*Walker*, we are delivered four categories, wherein the designated and limited public fora have nearly indistinguishable definitions, but different standards of review.

### ii. The Public Forum Doctrine Applied to *Mitchell*

Braving the Stygian swamp that envelops the public forum doctrine, we turn to the record in *Mitchell*. We reject instantly one category, the traditional public forum. Neither party contends that vanity plates constitute a traditional public forum, and we agree. Mitchell argues that vanity plates constitute either a designated or a limited public forum, or possibly both, and the State counters that vanity plates are a nonpublic forum, in the event we conclude (as we have) that their messages are private speech. The ultimate question is whether to review the present case under strict scrutiny or rational basis plus viewpoint neutrality. If, as Mitchell argues, vanity plates are a designated public forum, strict scrutiny applies. Mitchell argues alternatively that vanity plates are a limited public forum, erroneously maintaining that strict scrutiny applies there as well. The State argues for a finding of a nonpublic forum (as the Court of Special Appeals

---

(…continued)

coherence - to put it mildly"); Marc Rohr, *The Ongoing Mystery of the Limited Public Forum*, 33 NOVA L. REV. 299, 300 (2009) ("More than twenty-five years after the United States Supreme Court, in *Perry Education Ass'n v. Perry Local Educators' Ass'n*, purported to define and elucidate the components of its 'public forum' doctrine, the meaning—and legal significance—of the 'limited public forum' concept remains startlingly unclear."); ROBERT C. POST, CONSTITUTIONAL DOMAINS 199 (1995) (describing the public forum doctrine as "byzantine," "virtually impermeable to common sense," and the subject of "nearly universal condemnation from commentators"); Randall P. Bezanson & William G. Buss, *The Many Faces of Government Speech*, 86 IOWA L. REV. 1377, 1381 (2001) (criticizing the public forum doctrine as "so riven with incoherence and fine distinctions that it is on the verge of collapse").

concluded was the case), triggering rational basis and viewpoint neutrality review. Because speech restrictions in the limited public forum and the nonpublic forum receive the same standard of review, we need only consider whether vanity plates constitute a designated public forum or a nonpublic forum.

The *Walker* Court articulated the inquiry for differentiating public and nonpublic fora: a court asks whether the government "intentionally open[ed] a nontraditional forum for public discourse. And in order 'to ascertain whether [a government] intended to designate a place not traditionally open to assembly and debate as a public forum,' this Court 'has looked to the policy and practice of the government' and to 'the nature of the property and its compatibility with expressive activity.'" *Walker*, 135 S. Ct. at 2250 (quoting *Cornelius*, 473 U.S. at 802).[14]

---

[14] Mitchell argues that we should extrapolate from Fourth Circuit precedent that, he claims, found that specialty plates are a public forum where restrictions are reviewed under strict scrutiny, *Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of Virginia Dep't of Motor Vehicles*, 288 F.3d 610 (4th Cir. 2002) and *Planned Parenthood Of S. Carolina Inc. v. Rose*, 361 F.3d 786 (4th Cir. 2004), to find that vanity plates, axiomatically, must be also a public forum subject to strict scrutiny. Mitchell's argument is flawed materially. The *Sons* Court did not determine the forum at issue, but did apply strict scrutiny. 288 F.3d at 623, 627 ("we need not resolve the parties' dispute over the type of forum created by the special plate program."). In *Rose*, the court found that specialty plates are a limited public forum, but did not apply strict scrutiny. 361 F.3d at 798-99 ("The medium here-the specialty license plate scheme-is more like a limited forum for expression than it is like a school, museum, or clinic."). The *Rose* Court stated explicitly that the Supreme Court requires only that restrictions in a limited public forum must be reasonable and viewpoint neutral. 361 F.3d at 797 (citing *Rosenberger*, 515 U.S. at 829-30). Thus, Mitchell is asking us not only to disregard that these cases deal with specialty plates, not vanity plates, and that both cases have been superseded by *Walker*, but also to disregard the more recent of these two Fourth Circuit cases, which found that

(Continued…)

In 2001, the federal Second Circuit analyzed Vermont-issued vanity plates under the public forum doctrine. *Perry v. McDonald*, 280 F.3d 159 (2d Cir. 2001) [hereinafter *McDonald*, to avoid confusion with *Perry Educ. Ass'n*]. It identified five elements relevant to reviewing the government's policy and practice, and the nature and compatibility of the forum with expression. The Court considered Vermont's stated policy for issuing license plates generally: "to aid in vehicle identification." *McDonald*, 280 F.3d at 167. Next, the Court noted that the policy of vanity plates in particular was to raise revenue. *Id*. Although it found that neither of these factors were inconsistent necessarily with a State intent to create a public forum, they certainly do not evidence such an intent. The Court explored also the "extensive government regulation" that limits the expressive capacity of vanity plates: messages on plates are constrained to a small number of characters, and the State may deny prospective vanity messages that are "offensive or confusing to the general public." 280 F.3d at 167-68. (quotation marks omitted). Such regulation, the Court reasoned, "does not suggest an intent to designate a public forum." 280 F.3d at 168. Nor does the fact that the State restricted public access to vanity plates such that private individuals could not speak via the plate without State permission. *Id*. The federal court considered finally that "vanity plates are an unlikely means by which to engage in meaningful 'assembly and debate,' or other expressive activity," because of the limited "size and shape" of plates and the constraints imposed on

_____

(…continued)
specialty plates constitute a limited public forum subject to rational basis and viewpoint neutrality review.

the medium by the State's purpose of vehicle identification. *Id*. (quoting *Perry Educ. Ass'n*, 460 U.S. at 45). Reasoning that none of these factors suggest a State intent to designate a public forum, the Second Circuit held that no public forum was created.

Considering *McDonald*, the Court of Special Appeals concluded that, for the same reasons elucidated in *McDonald*, Maryland's vanity plates constitute a nonpublic forum. With respect to the State's policy and practice of issuing license plates, Maryland, since 1904, has required the display of a State-assigned registration number on every vehicle driven on public roads. *Mitchell*, 225 Md. App. at 574, 126 A.3d at 191–92 (citing Laws of Maryland, 1904, Ch. 518, codified in Md. Code (1904), Art. 56, § 132 (effective date Apr. 12, 1904)). Practices shifted early-on, but quickly stabilized: originally, drivers bore the responsibility of affixing their registration numbers to their vehicles in a conspicuously visible display of compliance, but by 1910, Maryland began to issue standardized license plates. *Mitchell*, 225 Md. App. at 574, 126 A.3d at 192. This policy and practice continues today, and "[t]his history makes clear that the purpose of the statutory mandate for license plates on vehicles registered in Maryland is identification of vehicles on the road." *Id.* With this reasoning, we agree.

Maryland began offering vanity plates in 1971. *Id.* From the vanity plate program's inception, Maryland has required applicants to pay a revenue-generating fee to the State. The Court of Special Appeals reasoned that because this revenue "is the single benefit the State enjoys from having a vanity plate program," the purpose of the program "was, and still is, to raise money." *Id.* This purpose does not evidence a State intent to facilitate the "full and free expression of ideas," but rather "to tap into the egocentricities

22

of vehicle owners, to the State's financial benefit." *Mitchell*, 225 Md. App. at 574-75, 126 A.3d at 192. Admittedly, Maryland did *intend* to open a public space for limited private expression via vanity plates, but only in the sense that it did not establish *accidentally* the procedures for vehicle owners to submit prospective vanity messages and procure vanity plates. This does not mean, however, that the State intended vanity plates to serve as a public forum, but rather, that they happen to afford a limited space for speech as an incentive to lure vehicle owners into paying for vanity plates, thereby achieving the MVA's purpose of raising revenue.[15] Accordingly, we agree that the policy and practices underlying the vanity plate program reveal no State intent to create a public forum.

Maryland constrains the expressive potential of vanity plates in accordance with the State's purposes for license plates in general and vanity plates in particular. The combination of characters on a plate, whether a vanity plate or otherwise, must be unique to serve as a government ID. The State limits vanity messages to seven characters, presumably because that is sufficient to register a unique combination of characters to each vehicle. Of course, as the Court of Special Appeals pointed out, pithy and clever individuals find invariably a way to express themselves in such a constrained space, *Mitchell*, 225 Md. App. at 576, 126 A.3d at 193, but that does not bear on whether the State intended to open a public forum. Maryland regulates also the content of vanity

---

[15] This reasoning could support categorization as a limited public forum, but again, that would lead to application of the same standard of scrutiny of the regulation as a finding of a nonpublic forum.

messages to prohibit, among other things, "profanities, epithets, or obscenities." COMAR 11.15.29.02(D). As discussed earlier, these constraints do not rise to the level of "direct control" necessary to support a finding of government speech, but they do amount to the "extensive government regulation" that the *McDonald* court found inconsistent with a governmental intent to create a public forum.

The Court of Special Appeals reasoned further that Maryland's restrictions on vanity plate access conflicts with finding that the State intended to open a public forum. Vanity plates are not open without limitation to the general public for private expression; only vehicle owners who pay a fee and receive State permission may receive vanity plates. "Public access is a hallmark of a public forum, so the fact that the Maryland general public does not have unimpeded access to vanity plates also militates against a conclusion that the State intended to create a public forum in vanity plates." *Mitchell*, 225 Md. App. at 575, 126 A.3d at 192. Supreme Court precedent supports this conclusion. The *Forbes* Court differentiated the designated public forum, characterized by "general access," from the nonpublic forum, exemplified by "selective access." 523 U.S. at 679. Maryland does not grant "general access" to vanity plates, even to members of the relevant class—fee-paying vehicle owners—for whom the forum of vanity plates was created. Rather, the State permits or denies vanity plates to individuals on a case-by-case basis, and "the government does not create a designated public forum when it does no more than reserve eligibility for access to the forum to a particular class of speakers,

whose members must then, as individuals, 'obtain permission.'" *Id.* (quoting *Cornelius*, 473 U.S. at 804).[16]

Finally, the Court of Special Appeals reasoned that the nature of vanity plates renders them incompatible with "'meaningful "assembly and debate" or other expressive activity.'" *Mitchell*, 225 Md. App. at 576, 126 A.3d at 193 (quoting *McDonald*, 280 F.3d at 168 (quoting *Perry Educ. Ass'n,* 460 U.S. at 45)). The State tailored the size and shape of vanity plates, the amount and content of speech they may display, and the extent of public access to vanity plates, all to fit its twin purposes of vehicle identification and revenue generation. The vanity plates' nature, therefore, reveals them to be a medium unfit for the kind of expression protected specially under the public forum doctrine. To illustrate the kind and quality of speech characteristic of public fora, the Supreme Court used descriptive language such as "marketplace of ideas," *Walker*, 135 S. Ct. at 2246, "assembly" and "debate," *Perry Educ. Ass'n,* 460 U.S. at 45, "discourse," *Cornelius*, 473 U.S. at 802, "public meetings," *City of Madison, Joint Sch. Dist. No. 8 v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 176 (1976), and the "discussi[on of] public questions," *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939). These terms suggest a depth of communication that exceeds the inherent limitations of the

_____

[16] The criterion of limited access seems to align with the Supreme Court's definition of a limited public forum, which "exists where a government has 'reserv[ed a forum] for certain groups or for the discussion of certain topics.'" *Walker*, 135 S. Ct. at 2250 (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 829 (1995)). But again, even if we found that vanity plates constitute a limited public forum, the standard of review would be the same as for a nonpublic forum, so we need not wade further into those murky waters.

vanity plate, which, in turn, suggest that the State did not intend to create vanity plates as a public platform in the marketplace of ideas. "The government does not create a public forum by . . . permitting limited discourse[.]" *Cornelius*, 473 U.S. at 802.[17]

---

[17] Mitchell argues that the Court of Special Appeals erred in reasoning that "a terse seven character vanity plate message that is viewed by many but cannot be meaningfully answered or commented upon is not the kind of full expressive activity that takes place in a public forum." *Mitchell*, 225 Md. App. at 576–77, 126 A.3d at 193. To bolster his argument, Mitchell turns to *Cohen v. California*, 403 U.S. 15 (1971), an opinion that overturned the conviction of a man for wearing, in a county courthouse, a jacket reading "Fuck the Draft," in violation of California's prohibition of disturbing the peace. "Fuck the Draft," Mitchell argues, is a statement, not "an invitation to discourse," and yet the Supreme Court protected it as free speech. We agree that speech need not be necessarily dialogue to be protected by the First Amendment, and, in any event, vanity plates do invite responses of a sort. A passing motorist may honk or give a "thumbs up" sign in approval, or alternatively, present the *digitus impudicus* to indicate disapproval, of a message such as "MIERDA." This line of reasoning, however, is irrelevant. *Cohen* dealt with whether the State could enact content-based limitations of public expression, in general, as disturbing the peace:

> Cohen was tried under a statute applicable throughout the entire State. Any attempt to support this conviction on the ground that the statute seeks to preserve an appropriately decorous atmosphere in the courthouse where Cohen was arrested must fail in the absence of any language in the statute that would have put appellant on notice that certain kinds of otherwise permissible speech or conduct would nevertheless, under California law, not be tolerated in certain places.

*Cohen*, 403 U.S. at 19. The present case, by contrast, deals specifically with restrictions that apply only to speech on government property. The public forum doctrine makes clear that reasonable and viewpoint-neutral content-based restrictions are permissible in some situations, namely in the limited public forum and in the nonpublic forum.

The *Cohen* Court recognized, moreover, that expression worthy of constitutional protection often "serves a dual communicative function: it conveys not only ideas capable of relatively precise, detached explication, but otherwise inexpressible emotions as well." *Cohen*, 403 U.S. at 26. In other words, the expletive "Fuck," in the *Cohen* case, served the "emotive function" of conveying the intensity of the speaker's viewpoint, which "may often be the more important element of the overall message sought to be communicated." *Id*. In the case of a stand-alone "MIERDA," however, the use of an expletive does not seem to add force to Mitchell's self-professed pro-agriculture

(Continued…)

26

Following the *Walker* formula for distinguishing public and nonpublic fora, we conclude that Maryland did not intend to create a public forum via vanity plates, based on the State's relevant policies and practices as well as vanity plates' nature and incompatibility with expressive activity as contemplated in the relevant Supreme Court jurisprudence.[18] Vanity plates are, therefore, a nonpublic forum, which "exists '[w]here the government is acting as a proprietor, managing its internal operations.'" *Walker*, 135

---

(…continued)
viewpoint. Instead, it appears to be intended as a mere play on words. In any event, Mitchell claims that he did not intend "MIERDA" as an expletive.

[18] Mitchell complains that the Court of Special Appeals engaged in circular reasoning by finding that the State's intent determines the type of forum at issue, and therefore the applicable standard of review. Essentially, the State may determine the standard of review its speech restrictions will face because the extent of regulation the State chooses to impose serves as evidence whether it intended to create a public or nonpublic forum. We acknowledge that scholars agree that this analysis is problematic:

> The general problem with the modern forum doctrine is not *Perry Education*'s simplistic hierarchy of fora, but its uncritical adoption, in *Cornelius* and *Kokinda* [*United States v. Kokinda*, 497 U.S. 720 (1990)], of the government intent standard for determining the level of judicial scrutiny applicable to fundamental, free speech rights. . . . In the modern forum decisions, the Court repeatedly asserts that the category of the forum determines the level of scrutiny. This suggests that the Court is relying on an *independent factor* to decide the role of judicial review. Yet, this suggestion is, in essence, misleading. Under the modern forum doctrine, it is not the nature of the location that determines the level of scrutiny; rather, it is the intent of the government officials who happen to manage the particular location. Under *Cornelius,* the factor determining the forum category is the intent of the government officials. Thus, instead of relying on a neutral factor for decisionmaking, the Court's deference to a seemingly "independent factor" is actually deferring to the wishes of government officials.

David S. Day, *The End of the Public Forum Doctrine*, 78 IOWA L. REV. 143, 186 (1992) (footnotes omitted). Mitchell's argument is not without some cogency, but he stumbles by alleging that the Court of Special Appeals chose erroneously to use this line of logic. This analytical framework comes straight from the Supreme Court. It is not within a Maryland court's purview to ignore or change it.

27

S. Ct. at 2251 (quoting *ISKCON*, 505 U.S. at 678-79). Maryland allows highly-constrained instances of private speech on vanity plates, but only as a part of revenue-generating operations. Moreover, "distinctions in access on the basis of subject matter and speaker identity . . . may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property." *Perry Educ. Ass'n*, 460 U.S. at 49. The MVA restricts speakers and their speech to fulfill the State's purpose of issuing vehicle IDs and raising revenue. Just as the Court of Special Appeals determined, we find Maryland's vanity plates to be a nonpublic forum.

II.     **The State's Ultimate Rejection of "MIERDA" was Reasonable and Viewpoint Neutral.**

The Supreme Court states that government restrictions on speech in a nonpublic forum must be reasonable and viewpoint neutral. *Cornelius,* 473 U.S. at 806 ("Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose of the forum and are viewpoint neutral."). Mitchell contends that "limiting the content of the speech [on vanity plates] is not rationally related to the revenue-generating function [of vanity plates] or the underlying vehicle-identification function [of license plates in general]," and that the State discriminated against his viewpoint by attributing to "MIERDA" "its view of what Mitchell means when he says 'mierda.'" The State responds to the contrary on both points. We agree with the Court of Special Appeals that COMAR

28

11.15.29.02(D) and the MVA's rescission of the "MIERDA" vanity plates under this regulation are reasonable and viewpoint neutral.

The prohibition of "profanities, epithets, or obscenities" on vanity plates relates reasonably to Maryland's purposes of vehicle identification and revenue generation, which involve the public display of license plates. Because the State requires motorists to display license plates on their vehicles, the public is exposed to the messages that appear on vanity plates. For better or worse, our society sets apart particular words as out-of-bounds; their utterance or display can be understood reasonably as indecent or offensive, especially in the presence of minors. "Shit" is one of these words, and that is an English translation, admitted by Mitchell, of "mierda." It is reasonable, therefore, for the State to protect knowledgeable observers of vanity plates from the perception of such a term. Even though a witness to a vanity plate message will discern easily the vehicle owner as the speaker, because the speech takes place on government property and only with State permission, the message will be associated with the State. *McDonald*, 280 F.3d at 169. "The state has a legitimate interest in not communicating the message that it approves of the public display of offensive scatological terms on state license plates," *id.*, and it is reasonable, therefore, for Maryland to prohibit "profanities, epithets, or obscenities," content with which it does not wish to associate.

Neither the MVA's content-restricting regulation, nor its actions in accordance with that regulation, constitute viewpoint discrimination. Viewpoint discrimination occurs when the government "targets . . . particular views taken by speakers on a subject," *Rosenberger*, 515 U.S. at 829, for example, "to discourage one viewpoint and

29

advance another." *Perry Educ. Ass'n*, 460 U.S. at 49. Here, the Maryland regulation targets only content—profanities, epithets, and obscenities—not a speaker's viewpoint about such terms or any viewpoint expressed with such terms. Clearly, the regulation does not target viewpoints in support of organic agriculture. If Maryland wished to suppress pro-agriculture speech, it probably would not speak in favor of agriculture via commemorative plates, and it would restrict the use on vanity plates of terms such as "FARM," "COMPOST," and "CROPS." This is not the case. Moreover, Maryland did not "impute an offensive intent" on the part of Mitchell, as he claims. Mitchell's subjective intent is irrelevant because the regulation restricts outright and objectively profanities, not specific viewpoints for or against profanity. The MVA rescinded Mitchell's plates not because of Mitchell's real or presumed intent, but based on the content with which Maryland is not willing to be associated, and the content the State is not willing to inflict upon the discerning public.[19]

---

[19] Mitchell cites a Virginia case, *Bujno v. Com., Dep't of Motor Vehicles*, 86 Va. Cir. 32 (2012), in which a trial court held that the State engaged in viewpoint discrimination by revoking an intentionally offensive vanity plate reading "ICUHAJI" pursuant to guidelines prohibiting messages that are "[s]ocially, racially, or ethnically offensive or disparaging." *Bujno*, 86 Va. Cir. 32 (quotation omitted). The *Bujno* Court reasoned that the State could have prohibited permissibly all racial or ethnic messages, but prohibiting only a subset, "offensive or disparaging" messages, constituted viewpoint discrimination. *Id.* Mitchell marshals this case in support of his argument that the MVA imputed to him a viewpoint, against which it discriminated. COMAR 11.15.29.02(D), however, prohibits all uses of "profanities, epithets, or obscenities," not just a subset of uses that have a particular subjective intent attached to them. Mitchell's intent in expressing "MIERDA" does not matter one wit under the regulation.

On the other hand, one could argue that Maryland's regulation discriminates implicitly against the viewpoint that there is nothing offensive about profanities, epithets,

(Continued…)

Mitchell contends further that English translations of non-English words are too imprecise a basis for speech restrictions. First, he insists that upholding the ALJ's decision to affirm the MVA based on one possible English translation of "mierda" "gives Maryland unlimited discretion" to inflict "collateral damage" on benign interpretations of a term such as "mierda."[20] This is false. Maryland does not have unlimited discretion because its decisions must be reasonable and viewpoint neutral. Mitchell is correct that collateral damage may occur: a term with various definitional senses, any one of which is a profanity or obscenity, may be banned even if the speaker intended one of the benign interpretations, but this is well-within Maryland's limited discretion to restrict the use of terms with which it wishes reasonably not to associate. As noted previously in this opinion, the speaker's intent is immaterial.

---

(…continued)

and obscenities. Indeed, the *Bujno* Court, quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989), stated that "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Bujno*, 86 Va. Cir. 32. COMAR 11.15.29.02(D), however, does not "prohibit the expression of an idea." It prohibits the use of certain words, regardless of the ideas they are intended to communicate. In fact, the communication on a vanity plate of the idea that profanity is good would not be restricted, so long as the message did not use profanity to convey its sentiment. COMAR 11.15.29.02(D) says nothing about the viewpoint or idea communicated, it affects only the content—the words—used to convey the idea.

[20] Mitchell argues also that the MVA has overly broad discretion under COMAR 11.15.29.02(G), which allows the agency to deny or rescind a plate that "[c]ontains any other combination that the Administrator finds unacceptable within the law." Mitchell raises this issue for the first time here. Pursuant to Md. Rule 8-131, we shall not consider this argument.

31

Second, Mitchell warns of the risk of "mischievous violence to the First Amendment" when the State may "censor the speech of the speakers of one language based on whether a translation of the word or the letters forming the word were considered a 'bad word' in one of more than 100 other languages," resulting in the possibility of "diminish[ed] freedom of speech in all affected languages." The Supreme Court allows States to "diminish freedom of speech" in a nonpublic forum, so this argument is unpersuasive. Certainly, the State must act reasonably and viewpoint-neutrally in its placement of a term on its "objectionable plate list," but that standard does not require the MVA to translate a non-English term into dozens of languages in order to balance benign translations against offensive ones, or to engage in some other form of trans-linguistic indecency calculus.

### III. The MVA acted in accordance with COMAR 11.15.29.02(D) based on substantial evidence.

"'When reviewing the decision of an administrative agency . . . we review the agency's decision directly, not the decision of the circuit court [or the intermediate appellate court].'" *Wicomico Cty. Dep't of Soc. Servs. v. B.A.*, 449 Md. 122, 132, 141 A.3d 208, 214 (2016) (quoting *Comptroller of Treasury v. Science Applications Int'l Corp.*, 405 Md. 185, 192, 950 A.2d 766, 770 (2008)). We review agency decisions, which are "prima facie correct," in "the light most favorable to the agency," *Motor Vehicle Admin. v. Lindsay*, 309 Md. 557, 563, 525 A.2d 1051, 1054 (1987), to determine whether "substantial evidence supports factual findings and no error of law exists. . . . We are under no constraint, however, to affirm an agency decision premised solely upon an

erroneous conclusion of law." *Tabassi v. Carrol Cty. Dep't of Social Servs.*, 182 Md. App. 80, 86, 957 A.2d 620, 623 (2008) (citations and quotation marks omitted). We conclude that the MVA rescinded "MIERDA" under COMAR 11.15.29.02(D) based on substantial evidence and that it drew no erroneous conclusions of law.

The MVA rescinded the "MIERDA" vanity plates under COMAR 11.15.29.02(D)'s restriction of messages including "profanities, epithets, or obscenities." The ALJ referred to COMAR 11.15.29.02(D) in affirming that "the MVA reasonably exercised its discretion under section 13-613 of the Transportation Article," one of the statutes authorizing MVA to rescind vanity plates. The ALJ did not elaborate on her reasoning other than to say that "many Spanish-speaking individuals might consider ["MIERDA"] obscene under at least one definition." The Court of Special Appeals rejected Mitchell's contention that, despite "MIERDA's" alleged inconsistency with Maryland's statutory definition of obscenity, the ALJ found narrowly that "MIERDA" was obscene. The appellate court found instead that the ALJ's ruling held that "MIERDA" fell under COMAR 11.15.29.02(D)'s restriction of "profanities, epithets, or obscenities." Thus, our appellate brethren held that, under the ALJ's decision, "MIERDA" could be obscene or profane, so whether "MIERDA" fit Maryland's definition of obscenity was irrelevant. Mitchell contends now that if the Court's reasoning meant that "MIERDA" is profanity, then it failed to consider that, unlike obscenity, profanity is protected by the First Amendment. This argument fails because, as discussed *supra*, in a nonpublic forum, the Supreme Court allows reasonable and viewpoint-neutral content-based restrictions of otherwise constitutionally-protected

33

speech. "[T]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Perry Educ. Ass'n*, 460 U.S. at 46 (quotation marks and citations omitted).

Mitchell argues further that "neither 'mierda' [n]or 'shit' are obscene or profane," implying that the Court of Special Appeals erred in holding that the MVA based its decision on substantial evidence and was free of legal error. Obscenity, Mitchell maintains, must entail an erotic subtext, *Diehl v. State*, 294 Md. 466, 473–74, 451 A.2d 115, 119 (1982) (citing *Roth v. United States,* 354 U.S. 476, *reh. den.,* 355 U.S. 852 (1957)), and profanity must have religious connotations, *Diehl*, 294 Md. at 473, 451 A.2d at 119 (citing *State v. Authelet,* 385 A.2d 642, 644 (R.I. 1978)). Because "mierda" connotes neither prurience nor blasphemy, Petitioner reasons that it cannot be obscene or profane. As the State responds, however, we are not compelled to give the terms "obscenity" and "profanity" such narrow definitions. After all, the MVA's interest in restricting vanity plate language is based on the typical interpretation and reaction of a common observer, such as a passing motorist, not necessarily an attorney versed in judicial parlance, such as Mitchell.

Merriam-Webster's "simple definition" of "profanity" includes "offensive language" and "an offensive word;" its "full definition" refers to "the quality or state of being profane." MERRIAM-WEBSTER, *Profanity*, http://www.merriam-webster.com/dictionary/profanity [https://perma.cc/T6PT-3DR8]. As an adverb, the "simple definition" of "profane" is "having or showing disrespect for religious things" and "relating to ordinary life: not religious or spiritual," and its "full definition" is "not

34

concerned with religion or religious purposes," "not holy because unconsecrated, impure, or defiled," "serving to debase or defile what is holy," and "not being among the initiated." MERRIAM-WEBSTER, *Profane*, http://www.merriam-webster.com/dictionary/profane [https://perma.cc/ZYD3-LRXW]. The simple definition of "profanity" does not involve any element of blasphemy, despite the term's etymological and historical roots in distinguishing the sacred from the ordinary, suggesting that a contemporary, "simple" understanding of the term need not entail religious connotations.

Similarly, Merriam-Webster provides simple and full definitions of "obscenity:" simply, "obscenity" is "the quality or state of being obscene," "obscene words or actions," and "an offensive word," and in full, it means additionally "something (as an utterance or act) that is obscene." MERRIAM-WEBSTER, *Obscenity*, http://www.merriam-webster.com/dictionary/obscenity [https://perma.cc/3JAE-MLEW]. "Obscene," in turn, means simply "relating to sex in an indecent or offensive way," "very offensive in usually a shocking way," and "so large an amount or size as to be very shocking or unfair," and in full, it means "disgusting to the senses," "abhorrent to morality or virtue; specifically: designed to incite to lust or depravity," "containing or being language regarded as taboo in polite usage," "repulsive by reason of crass disregard of moral or ethical principles," and "so excessive as to be offensive." MERRIAM-WEBSTER, *Obscene*, http://www.merriam-webster.com/dictionary/obscene [https://perma.cc/SB4D-JYSN]. "Obscenity," therefore, may, but need not, involve erotic implications.

35

"Mierda" and "shit" could be profanity ("offensive language") or obscenity ("an offensive word" or "the quality or state of being" "very offensive in usually a shocking way") under ordinary definitions of the words. We find, therefore, that the MVA made no erroneous conclusion of law when it determined that COMAR 11.15.29.02(D) applies to "MIERDA."

Moreover, substantial evidence supported the MVA's determination. We do not substitute our judgment for that of the agency, but rather, determine whether the MVA's decision was based on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Caucus Distributors, Inc. v. Maryland Sec. Com'r*, 320 Md. 313, 324, 577 A.2d 783, 788 (1990). Crow's Wikipedia research (received in evidence by the ALJ without objection) revealed "mierda" to be an expletive in Spanish slang that translates in its primary sense into "shit," an expletive in English. Mitchell's testimony corroborated that "mierda" means "shit," among other things, in English. Finally, the MVA maintained that it received a complaint from an observer of the vanity plate at issue about the inappropriateness of "MIERDA." This evidence is adequate in an administrative law context for a "reasonable mind" to conclude, as did the MVA, that the State could rescind permissibly Mitchell's "MIERDA" vanity plates.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**