IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
April 3, 2024 Session Heard at Memphis[1]

## LEAH GILLIAM v. DAVID GERREGANO, COMMISSIONER OF THE TENNESSEE DEPARTMENT OF REVENUE ET AL.

**Appeal by Permission from the Court of Appeals
Chancery Court for Davidson County, Special Panel
No. 21-606-III
Ellen Hobbs Lyle, Chancellor; Doug Jenkins, Chancellor; and
Mary L. Wagner, Judge**

_____

**No. M2022-00083-SC-R11-CV**

_____

For over a decade, Leah Gilliam's vehicle displayed a personalized license plate that read "69PWNDU." The State eventually revoked the plate after deeming the message offensive. Gilliam sued state officials, alleging that Tennessee's personalized license plate program discriminates based on viewpoint in violation of the First Amendment. The State argues that the First Amendment's prohibition of viewpoint discrimination does not apply to the alphanumeric characters on Tennessee's personalized license plates because they are government speech. In *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, the United States Supreme Court held that Texas's specialty license plate designs were government speech. 576 U.S. 200, 213 (2015). Although personalized alphanumeric combinations differ from specialty plate designs in some respects, a faithful application of *Walker*'s reasoning compels the conclusion that they are government speech too. We reverse the Court of Appeals' contrary holding and reinstate the trial court's judgment in favor of the State.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed**

SARAH K. CAMPBELL, J., delivered the opinion of the Court, in which HOLLY KIRBY, C.J., and JEFFREY S. BIVINS, ROGER A. PAGE, and DWIGHT E. TARWATER, JJ., joined.

Jonathan Skrmetti, Attorney General and Reporter; J. Matthew Rice, Solicitor General; and Joshua D. Minchin, Office of the Solicitor General Honors Fellow, for the appellants, the Commissioner of the Tennessee Department of Revenue and the Tennessee Attorney General and Reporter.

---

[1] We heard argument in this case at the Cecil C. Humphreys School of Law at the University of Memphis.

Daniel A. Horwitz, Lindsay Smith, Melissa K. Dix, Shannon C. Kerr, and David Hudson, Jr., Nashville, Tennessee, for the appellee, Leah Gilliam.

Lee Davis, Chattanooga, Tennessee, and Adam Steinbaugh, Philadelphia, Pennsylvania, for the amicus curiae, Foundation for Individual Rights and Expression.

Edward M. Bearman, Memphis, Tennessee, and Clyde F. DeWitt III and Cathy E. Crosson, Las Vegas, Nevada, for the amicus curiae, First Amendment Lawyers Association.

Sarah L. Martin, Nashville, Tennessee, and Eugene Volokh, Los Angeles, California, for the amicus curiae, Simon Tam.

**OPINION**

I.

A.

Tennessee residents must register their motor vehicles with the State before operating them on Tennessee's roads. Tenn. Code Ann. § 55-4-101(a)(1) (2024). This registration requirement has existed for more than a century. *See* Act of April 4, 1905, ch. 173, § 1, 1905 Tenn. Pub. Acts 371, 371. For just as long, Tennessee has required motor vehicles to display a license plate containing a unique registration code. *See id.* § 2; Tenn. Code Ann. § 55-4-103(b)(1) (2024). At first, the State assigned each vehicle a registration number but did not issue standard plates; it instead mandated that vehicle owners supply their own. *See* Act of April 4, 1905, ch. 173, § 2, 1905 Tenn. Pub. Acts 371, 371–72; James K. Fox, *License Plates of the United States* 95 (1994). Those plates were either homemade or storebought and "made of every imaginable material, including metal, leather, wood[,] and porcelain." Fox, *supra*, at 95. Perhaps because of the wide variation in homemade license plates, the State began issuing standard license plates in 1915. *Id.*; *see also* Act of January 27, 1915, ch. 8, § 3, 1915 Tenn. Pub. Acts 14, 15.

From 1915 until 1998, each license plate contained the word "Tennessee" or the abbreviation "Tenn." along with a state-generated unique number or alphanumeric combination that identified the vehicle. Fox, *supra*, at 94. At various times, plates also featured the county name, the shape of the State, the state seal, a tri-star design, the words "Volunteer State" or "TNvacation.com," or the national motto "In God We Trust." *See id.*; Tenn. Code Ann. § 55-4-103(b)(1), (b)(5)(A); Caroline Sutton, *New Tennessee License Plate Design Revealed*, News Channel 5 Nashville (Oct. 5, 2021, 9:06 PM), https://perma.cc/P8KK-UZWD.

- 2 -

In 1998, Tennessee began offering specialty plate designs and personalized plates in addition to standard license plates. *See* Act of May 1, 1998, ch. 1063, § 1, 1998 Tenn. Pub. Acts 965, 965–1006 (codified as amended in scattered sections of Tenn. Code. Ann. §§ 55-4-201 to -299 (2024)). Personalized plates—also called vanity plates—allow drivers to choose a specific alphanumeric combination to display on their license plate instead of a state-generated combination. *See* Tenn. Code Ann. §§ 55-4-201, -202, -203, -210, -214 (2024); Tenn. Comp. R. & Regs. 1320-08-01-.02 (2006).

Whether randomly generated or personally selected, the alphanumeric combination on a license plate must be unique; it cannot duplicate one the State has already issued. Tenn. Code Ann. § 55-4-103(b) ("Registration plates shall bear individual distinctive alphanumerical characters not to exceed a combination of seven (7) as determined by the commissioner."); *id.* § 55-4-210(e) ("Registration numbers for license plates issued pursuant to [Tennessee's personalized license plate program] shall not conflict with or duplicate the registration numbers for any existing . . . motor vehicle registration plate . . . ."). Each combination must contain seven or fewer alphanumeric characters. *Id.* §§ 55-4-103(b)(1), -201(6), -205. The license plate containing the combination must be "attached on the rear of the vehicle" and "clearly visible" at all times. *Id.* § 55-4-110(a)–(c)(1). And the plate and distinct combination must "be of sufficient size to be readable from a distance of one hundred feet." *Id.* § 55-4-103(c).

To obtain a personalized plate, a vehicle owner must complete an application and pay an additional $35 fee. *Id.* § 55-4-202. The applicant may request up to three alphanumeric combinations, ranked in order of preference. The Commissioner of the Department of Revenue has statutory authority to approve or deny any proposed combination. *Id.* § 55-4-210(d)(1)–(2). The application states in bold that "Tennessee reserves the right to refuse to issue objectionable combinations." The Commissioner is statutorily prohibited from issuing "any license plate commemorating any practice which is contrary to the public policy of the state" or "any combination of letters, numbers or positions that may carry connotations offensive to good taste and decency or that are misleading." *Id.* § 55-4-210(d)(1)–(2).

Tennessee's Department of Revenue reviews all applications for personalized plates, and a personalized plate may not be issued without the Department's approval. *Id.* § 55-4-210(a); Tenn. Comp. R. & Regs. 1320-08-01-.02. Employees in the Department's Inventory and Specialized Application Unit complete the first level of review. A five-person team evaluates eighty to one hundred applications per day to determine whether the proposed alphanumeric combinations comply with statutory requirements. That evaluation includes determining whether the combination is "offensive to good taste and decency." Since its inception, the Inventory Unit has rejected nearly one thousand requested combinations on that basis. Tennessee currently has around sixty thousand active personalized plates.

To facilitate the review of personalized plate applications, the Department identified several objectionable categories including profanity, violence, sex, illegal substances, derogatory slang terms, and racial or ethnic slurs. These categories do not appear in the Department's regulations, however, or in any handbook or other official document. When reviewing applications, the Inventory Unit also consults the Urban Dictionary and an internal document called the "Objectionable Table" that lists thousands of configurations previously deemed objectionable. That table includes references to profanity (e.g., "FUCOFF"); violence (e.g., "MURDER"); sexual activity (e.g., "ORGY"); illegal substances (e.g., "KOCAINE"); and racial or ethnic groups (e.g., "NOJEWS"). The Department also has a general policy of rejecting configurations with the sequence "69" because of that number's sexual connotation, unless the number refers to the vehicle's model year.

If the reviewing member of the Inventory Unit determines that the requested combination is not prohibited and the application satisfies all other requirements, the application is approved. If the reviewer does not recommend approval, the application "moves up the chain" for further review.

But the review process is far from perfect. Examples abound of personalized plates approved by the Inventory Unit that should have been deemed objectionable under the Department's review criteria. As a sampling, the Department approved plates containing the combinations "SHTUNOT," "BUTNKD," "694FUN," "BIGSEXI," "69BEAST," and "69PONY."

In those situations, the Department has authority to rescind the erroneously issued plates. Tenn. Code Ann. § 55-5-117(a)(1) (2024). When the Department considers revocation, the combination at issue is reviewed by the Department's Commissioner and legal counsel. If a plate is revoked, the vehicle owner must return the plate to the Department. *Id.* § 55-5-119(a) (2024). The owner may then request a different combination or be refunded the personalized plate application fee.

Personalized plates are issued "for the applicant's use only on the authorized motor vehicle." *Id.* § 55-4-212(a)(9). If the vehicle owner transfers title to the vehicle, he or she must "surrender the plate to the [D]epartment through the county clerk" or apply to transfer the plate to another vehicle. *Id.* § 55-4-212(a)(9)–(10).

B.

In December 2010, Leah Gilliam applied for a personalized plate. She requested three different alphanumeric combinations, in order of preference: (1) 69PWNDU, (2) PWNDU69, (3) IPWNDU. In a section of the application that allows the applicant to explain the significance of the characters selected, Gilliam wrote: "PWND=vid gaming

term[.] The first one is my google phone number." Gilliam later claimed that she is an "astronomy buff" and that "69" was a reference to the year of the moon landing. The parties agree, however, that "69" often has a sexual connotation. As Gilliam noted in her application, "PWND" is an expression that originated in the gaming community; it means to be owned or dominated. *pwned*, Urban Dictionary, https://perma.cc/XKQ4-J9PP.

Even though Gilliam's requested alphanumeric combination included the number "69," the Inventory Unit approved her application and issued a plate that read "69PWNDU." Gilliam displayed the plate on her vehicle for the next eleven years. During those eleven years, the Department received no complaints about the plate.

In May 2021, the Department of Revenue's Director of Personnel, Justin Moorhead, received a text on his personal cell phone alerting him to Gilliam's license plate. Moorhead brought the plate to the attention of the Inventory Unit. The Department reviewed the plate and determined that it should be revoked because it referred to sexual domination.

Later that month, the Department informed Gilliam via letter that it was revoking her personalized plate. The letter explained that the Department had deemed her plate offensive in violation of Tennessee Code Annotated section 55-4-210(d)(2). It also notified Gilliam that she could either apply for a different personalized plate or receive a standard plate instead.

C.

The next month, Gilliam requested an administrative hearing regarding the revocation. About two weeks later, she sued the Commissioner of the Department of Revenue and the Tennessee Attorney General in Davidson County Chancery Court. Her complaint alleged that section 210(d)(2) is facially unconstitutional because it discriminates based on viewpoint in violation of the First Amendment to the United States Constitution and is void for vagueness. She also challenged the Department's summary revocation process under the federal Due Process Clause. Gilliam sought injunctive and declaratory relief as well as nominal damages.

Because Gilliam's complaint involved a constitutional challenge to a state law, it was referred to a three-judge panel under Tennessee Code Annotated section 20-18-101 (2021). The panel held a bench trial in December 2021. Four witnesses testified at trial: George S. Scoville, III, a Tennessean with a personalized license plate; Alan Secrest, an expert witness in polling and polling methodology; Demetria Hudson, the Department's Vehicle Services Assistant Director and the State's designee under Tennessee Rule of Civil Procedure 30.02(6); and Tammi Moyers, manager of the Inventory Unit.

Scoville testified that he considers the message conveyed by his personalized plate to be his own, not the government's. Secrest discussed a survey he conducted of two hundred Tennesseans, the results of which indicated that eighty-seven percent of those surveyed consider the alphanumeric combination on a personalized license plate to be the vehicle owner's speech. Hudson testified, among other things, that Gilliam's alphanumeric combination conveyed Gilliam's message, not the government's. Moyers described the Department's process for reviewing applications. Gilliam also introduced into evidence a Tennessee government website stating that, "[i]n Tennessee, license plates can be personalized with your own unique message."

The panel rejected Gilliam's constitutional claims and entered judgment for the state defendants. As relevant here, the panel concluded that section 210(d)(2) does not violate the First Amendment because the alphanumeric combinations on personalized license plates are government speech that does not implicate the First Amendment's prohibition of viewpoint discrimination. To reach that conclusion, the panel examined the same factors as the United States Supreme Court in *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*: (1) the history of the medium's use to convey state messages, (2) whether the expression is "closely identified in the public mind" with the State, and (3) whether the State maintains "direct control over the messages conveyed." 576 U.S. 200, 209–13 (2015).

The panel first concluded that both license plates generally and personalized plates specifically have been used to convey state messages. Next, the panel determined that "a viewer of a personalized plate in Tennessee associates the plate with the State of Tennessee . . . because . . . each Tennessee license plate is a government article serving the government purposes of vehicle registration and identification." Finally, the panel concluded that Tennessee maintains "direct control over the messages conveyed on all of its license plates" because it "must approve every personalized plate" and has authority to revoke any plates issued erroneously.

The Court of Appeals reversed. *Gilliam v. Gerregano*, No. M2022-00083-COA-R3-CV, 2023 WL 3749982 (Tenn. Ct. App. June 1, 2023), *perm. app. granted*, (Tenn. Nov. 21, 2023). The court concluded that the first and second *Walker* factors tilted toward private speech, while the third factor was neutral. *Id.* at *11–14. The court focused its historical analysis on the personalized license plate program rather than license plates or alphanumeric combinations more generally. *Id.* at *11–12. Based on that analysis, the court concluded that Tennessee had not historically conveyed state messages through personalized license plate numbers. *Id.* It rejected the State's argument that personalized plates had been used to convey messages of identification. *Id.* at *11. In concluding that the second factor suggested that personalized plates are private speech, the court placed significant weight on Scoville's testimony and the poll that Secrest performed. *Id.* at *12. As for control, the court acknowledged the Department's authority to approve personalized

plate applications and revoke erroneously issued plates. But it was troubled by the Department's inconsistent regulation. *Id.* at \*14.

We granted the state defendants' application for permission to appeal. That application raised a single issue: whether alphanumeric registration characters on personalized license plates are government speech.

## II.

We review issues of constitutional law de novo, without affording the trial court's legal conclusions any presumption of correctness. *E.g.*, *Fisher v. Hargett*, 604 S.W.3d 381, 395 (Tenn. 2020); *Bredesen v. Tenn. Jud. Selection Comm'n*, 214 S.W.3d 419, 424 (Tenn. 2007); *Gallaher v. Elam*, 104 S.W.3d 455, 460 (Tenn. 2003). When a case was tried by a judge instead of a jury, we presume the trial court's factual findings are correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *King v. Anderson Cnty.*, 419 S.W.3d 232, 245 (Tenn. 2013).

We presume that acts of the legislature are constitutional, *Gallaher*, 104 S.W.3d at 459, and "indulge every presumption and resolve every doubt in favor of constitutionality," *Lynch v. City of Jellico*, 205 S.W.3d 384, 390 (Tenn. 2006) (quoting *Vogel v. Wells Fargo Guard Servs.*, 937 S.W.2d 856, 858 (Tenn. 1996)). To prevail on a facial constitutional challenge, a plaintiff "must establish that no set of circumstances exist[s] under which the [law] would be valid." *Id.* at 390 (quoting *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 525 (Tenn. 1993)).

## III.

The single issue presented by this appeal is whether the alphanumeric characters on Tennessee's personalized license plates are government speech. Gilliam challenged the State's vanity license plate program under the federal Constitution, so we are bound by United States Supreme Court precedent in resolving that issue. *See Lavon v. State*, 586 S.W.2d 112, 114 (Tenn. 1979).[2] We begin by examining that Court's government speech precedents before applying them to the facts before us.

### A.

The First Amendment to the United States Constitution prohibits the government from "abridging the freedom of speech." U.S. Const. amend. I. Among other things, that means that the government may not regulate speech in a manner that discriminates based

---

[2] Because Gilliam did not assert any claims under the Tennessee Constitution, we have no occasion to consider whether the government speech analysis would be different under state constitutional free speech protections.

on the viewpoint the speech expresses. *See Iancu v. Brunetti*, 588 U.S. 388, 393 (2019) ("The government may not discriminate against speech based on the ideas or opinions it conveys."); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–30 (1995) (describing viewpoint discrimination as an "egregious form of content discrimination" that is "presumptively unconstitutional").

But the First Amendment does not constrain the government when it is speaking for itself. *See, e.g.*, *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009); *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005). Were the rule otherwise, it would be difficult for the government to function. The government must adopt and convey particular viewpoints to achieve its policy goals. *See, e.g.*, *Matal v. Tam*, 582 U.S. 218, 234 (2017); *Walker*, 576 U.S. at 207–08; *Summum*, 555 U.S. at 468. If the public disagrees with those viewpoints, its remedy lies in the political process, not the First Amendment. *See, e.g.*, *Summum*, 555 U.S. at 468–69.

Sometimes, the government "receives assistance from private sources" when it "deliver[s] a government-controlled message." *Id.* at 468. When private speakers are involved, it can be "difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech." *Id.* at 470; *see also Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022) ("The boundary between government speech and private expression can blur when . . . a government invites the people to participate in a program."). The line between government speech and private speech must be drawn carefully because "the government-speech doctrine . . . is susceptible to dangerous misuse." *Tam*, 582 U.S. at 235. "If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Id.*

In the past two decades, the United States Supreme Court has attempted to draw the line between government speech and private speech in four different cases. In the first two—*Summum* and *Walker*—the Court agreed with the government that the speech at issue was government speech. In the more recent two—*Tam* and *Shurtleff*—the Court rejected the government-speech argument.

In *Summum*, the Court considered whether a city's display of monuments in a public park was government speech. 555 U.S. at 464. Eleven of the fifteen monuments displayed in the park had been donated by private groups. *Id.* The Court unanimously concluded that the monuments comprising the display were government speech. First, the Court explained that "[g]overnments have long used monuments to speak to the public." *Id.* at 470. And "privately financed and donated monuments that the government accepts and displays to the public on government land," *id.* at 470–71, speak for the government in the same way, even if they convey a meaning different from the one intended by the monument's donor or creator, *id.* at 476. Second, the Court noted that "persons who observe donated

monuments routinely—and reasonably—interpret them as conveying some message on the property owner's behalf." *Id.* at 471. Third, the Court found that the city had "'effectively controlled' the messages sent by the monuments in the Park by exercising 'final approval authority' over their selection." *Id.* at 473 (quoting *Johanns*, 544 U.S. at 560–61).

A few years later, in *Walker*, the Court considered whether Texas's specialty license plate designs were government speech. 576 U.S. at 203–04. For an additional fee, Texas allowed vehicle owners to bypass the standard license plate design and instead "choose from an assortment of specialty license plates." *Id.* at 204. Some of the designs were specifically authorized by Texas's legislature, while others were created at the request of private individuals or organizations. *Id.* at 205.[3]

Relying heavily on the analysis in *Summum*, a majority of the Court concluded that Texas's specialty plate designs are government speech. *Id.* at 210. Turning first to history, the Court reasoned that, "insofar as license plates have conveyed more than state names and vehicle identification numbers, they long have communicated messages from the States." *Id.* at 210–11. For example, States "ha[d] used license plate slogans to urge action, to promote tourism, and to tout local industries." *Id.* at 211. The Court pointed to several such slogans that Texas had used in the past "to communicate through its license plate designs." *Id.*

Next, the Court concluded that Texas's plate designs "are often closely identified in the public mind with the [State]." *Id.* at 212 (alteration in original) (quoting *Summum*, 555 U.S. at 472). The Court noted that "[e]ach Texas license plate is a government article serving the governmental purposes of vehicle registration and identification" and that Texas "owns the designs on its license plates, including the designs that Texas adopts on the basis of proposals made by private individuals and organizations." *Id.* at 212. The Court equated license plates to "government IDs" and reasoned that "a person who displays a message on a Texas license plate likely intends to convey to the public that the State has endorsed that message." *Id.* Otherwise, that individual "could simply display the message . . . in larger letters on a bumper sticker right next to the plate." *Id.*

Finally, the Court found that "Texas maintains direct control over the messages conveyed on its specialty plates" because it has "final approval authority" over the designs and had "actively exercised this authority" by "reject[ing] at least a dozen proposed designs." *Id.* at 213. The Court underscored that the involvement of private parties "in the design and propagation of a message does not extinguish the governmental nature of the message or transform the government's role into that of a mere forum-provider." *Id.* at 217. It also made clear that the "holding in *Summum* was not dependent on the precise number

---

[3] Texas also had a personalized license plate program similar to Tennessee's that allowed a vehicle owner to request a particular alphanumeric combination, but only the specialty license plate designs were at issue in *Walker*. 576 U.S. at 204.

of monuments found within the park," that "Texas's desire to communicate numerous messages does not mean that the messages conveyed are not Texas's own," and that "the existence of government profit alone is insufficient to trigger forum analysis." *Id.* at 217–18.

Justice Alito dissented in *Walker* in an opinion joined by Chief Justice Roberts and Justices Scalia and Kennedy. *Id.* at 221–36 (Alito, J., dissenting). The dissent accused the majority of "badly misunderstand[ing] *Summum*." *Id.* at 227. The dissent agreed that state mottos and other state-created slogans that promote state programs "can be considered government speech." *Id.* at 230.[4] In the dissent's view, however, "plates that are essentially commissioned by private entities . . . and that express a message chosen by those entities are very different—and quite new." *Id.* The dissent did not believe Texas had exercised "the 'selective receptivity' present in *Summum*." *Id.* at 231. Rather than "approve only those proposed plates that convey messages that the State supports," Texas had "proclaim[ed] that it is open to all private messages—except those . . . that would offend some who viewed them." *Id.* at 232. The dissent found it implausible that a reasonable observer would think "the sentiments reflected in these specialty plates are the views of the State of Texas and not those of the owners of the cars." *Id.* at 221–22. For example, the dissent questioned whether a plate that read "Rather be Golfing" would really prompt an observer to conclude that it is the State's official policy that it is better to golf than to work. *Id.* at 222. The dissent further distinguished *Summum* by pointing out that, while a "park can accommodate only so many permanent monuments," the number of specialty license plate designs is limited only by "the number of registered vehicles." *Id.* at 232–33. Moreover, while the private monuments at issue in *Summum* were donated, vehicle owners who wish to obtain a specialty plate "must pay an increased annual registration fee." *Id.* at 233. According to the dissent, Texas was effectively selling "space available on millions of little mobile billboards . . . to those who wish to use it to express a personal message—provided only that the message does not express a viewpoint that the State finds unacceptable." *Id.*

*Tam* involved a First Amendment challenge to a statutory provision that allowed the federal government to deny an application for trademark registration if the trademark at issue was disparaging. 582 U.S. at 223 (citing 15 U.S.C. § 1052(a)). The government maintained that registered trademarks are government speech and that the government therefore may discriminate based on viewpoint in deciding whether to register a trademark. *Id.* at 233–34. The Court rejected that argument. *Id.* at 236. Calling the government's argument "far-fetched," the Court noted that "[n]one of [the Court's] government speech cases even remotely supports the idea that registered trademarks are government speech."

---

[4] The dissent noted that "all license plates unquestionably contain *some* government speech," including "the name of the State and the numbers and/or letters identifying the vehicle." *Id.* at 222. It is unclear whether the dissent intended this reference to include personalized alphanumeric combinations in addition to randomly generated combinations.

*Id.* at 236–37. The government did not create the trademarks or edit marks submitted for registration, and it could not reject a mark for any reason other than its disparaging viewpoint. *Id.* at 235. After a mark was registered, moreover, it was difficult for the government to remove it. *Id.* at 236. Registration did not "constitute approval of a mark," and it was "unlikely that more than a tiny fraction of the public ha[d] any idea what federal registration of a trademark means." *Id.* at 237. "If the federal registration of a trademark makes the mark government speech," the Court reasoned, then "the Federal Government is babbling prodigiously and incoherently." *Id.* at 236.

The federal government relied on *Walker* in pressing its argument that registered trademarks are government speech, but the Court found that trademarks implicated none of the factors that were present in *Walker*. *Id.* at 238. Moreover, the Court said that *Walker* "likely marks the outer bounds of the government-speech doctrine" and cautioned that "we must exercise great caution before extending our government-speech precedents." *Id.* at 235, 238. Holding that registered trademarks are government speech, the Court warned, "would constitute a huge and dangerous extension of the government-speech doctrine" that could lead to "other systems of government registration," such as copyright registration, being "characterized in the same way." *Id.* at 239.

Finally, in *Shurtleff*, the Court considered whether Boston's practice of allowing private parties to hoist flags on one of the flagpoles on City Hall Plaza was government speech. 596 U.S. at 247–48. To answer that question, the Court "conduct[ed] a holistic inquiry designed to determine whether the government intends to speak for itself or to regulate private expression." *Id.* at 252. Although the Court emphasized that this review should be "driven by a case's context rather than the rote application of rigid factors," it ultimately examined the same sorts of evidence that had guided its analysis in past cases: "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.*

The Court concluded that the "general history" of flag flying favored Boston because flags "have long conveyed important messages about government." *Id.* at 253–54. But the "details" of the specific flag-flying program at issue made it questionable whether the public would perceive flags raised by private groups as expressing a government message. *Id.* at 255–56. The Court noted that these flags "were raised in connection with ceremonies at the flagpoles' base and remained aloft during the events." *Id.* at 255. Thus, "even if the public would ordinarily associate a flag's message with Boston, that is not necessarily true for" the flags raised by private groups. *Id.* The "most salient feature" of the case was Boston's failure to exercise any "control over the flags' content and meaning." *Id.* at 256–57. Although the city approved requests to hold events on City Hall Plaza, it "told the public that it sought 'to accommodate all applicants,'" and the city employee who reviewed the applications testified that he had "never requested to review a flag" or

"requested changes to a flag in connection with approval." *Id.* Indeed, that employee did not "even see flags before the events." *Id.* at 257. The city "approv[ed] flag raisings, without exception" and had "no record of denying a request until" the plaintiff sought to fly a Christian flag. *Id.*

B.

We follow *Shurtleff*'s approach and evaluate whether the alphanumeric combinations on Tennessee's personalized license plates are government speech by considering the following factors: "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." 596 U.S. at 252. We remain mindful, however, that the government speech inquiry is "holistic" and should be "driven by a case's context." *Id.* The ultimate question this inquiry is designed to answer is "whether the government intends to speak for itself or to regulate private expression." *Id.*

1.

First, we consider history. The parties dispute the level of generality at which we should conduct our historical inquiry. The State points us to Tennessee's historical use of registration numbers generally, while Gilliam urges us to focus on the details of Tennessee's personalized plate program. In *Walker*, the Court examined generally whether, "insofar as license plates have conveyed more than state names and vehicle identification numbers," they had "communicated messages from the States." 576 U.S. at 210–11. The Court also discussed Texas's license plates—it noted that Texas had "communicate[d] through its license plate designs" and gave as examples slogans and emblems that appeared on its general-issue plates as well as legislatively authorized specialty plate designs. *Id.* at 211–12. In *Shurtleff*, the Court looked to the "general history" of "flag flying, particularly at the seat of government." 596 U.S. at 253. But it also considered "the details of *this* flag-flying program." *Id.* at 255. Given our obligation to conduct a "holistic" government speech analysis, *id.* at 252, we consider both the general history of alphanumeric combinations on license plates and the specific history of Tennessee's personalized plate program.

"License plates originated solely as a means of identifying vehicles." *Walker*, 576 U.S. at 223 (Alito, J., dissenting). States began requiring automobiles to display registration numbers on license plates in the early twentieth century. *Id.*; *see generally* Fox, *supra*, 10–111. In 1905, Tennessee began requiring vehicle owners to register their cars with the State and to display the registration number assigned to them in a "conspicuous manner at both the front and rear of such automobile." Act of April 4, 1905, ch. 173, §§ 1–2, 1905 Tenn. Pub. Acts 371, 371–72. Today, vehicle owners are still required to display a distinct

registration number on their license plates in a "clearly visible" manner. Tenn. Code Ann. §§ 55-4-110(b), -210(e). The registration number communicates to law enforcement and members of the public that the number can be used to identify the vehicle. *E.g.*, *Walker*, 576 U.S. at 212 (majority opinion) ("Each Texas license plate is a government article serving the governmental purposes of vehicle registration and identification."); *United States v. Ellison*, 462 F.3d 557, 561 (6th Cir. 2006) ("The very purpose of a license plate number . . . is to provide identifying information to law enforcement officials and others.").

Gilliam argues that this display of identifying information is not government speech; in her view, the government speaks only if it communicates "messages or ideas." But even "dry information, devoid of advocacy, political relevance, or artistic expression"—such as technical scientific information, instructions, and recipes—constitutes speech. *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 446–47 (2d Cir. 2001); *see also Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976) (explaining that purely factual information about "who is producing and selling what product, for what reason, and at what price" is protected speech); *Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1435 (N.D. Cal. 1996) (explaining that "[i]nstructions, do-it-yourself manuals, [and] recipes" are all "speech"). The randomly generated alphanumeric combinations on Tennessee's license plates are the government's medium for communicating identifying information about the vehicle. The general history of Tennessee's registration numbers thus favors the State.

What about the specific history of Tennessee's personalized plate program? As Gilliam notes, that program has been around for only twenty-six years. But throughout that time, the alphanumeric combinations on Tennessee's personalized plates—like the combinations on Tennessee's general-issue plates—have communicated identifying information about the vehicles on which they are displayed. These personalized combinations must be distinct from other combinations already issued. *See* Tenn. Code Ann. § 55-4-210(e). And the plate containing the personalized combination must be "clearly visible" and "readable from a distance of one hundred feet." *Id.* §§ 55-4-103(c), -110(b); *see also id.* § 55-4-110(a), (c)(1).

According to Gilliam, Tennessee's personalized alphanumeric combinations could not possibly convey messages from the government because the State told applicants that personalized plates would contain their "own unique message." Different speakers, however, may convey different things through the same medium of speech. In *Summum*, for example, the Court explained that "the thoughts or sentiments expressed by a government entity that accepts and displays . . . an object may be quite different from those of either its creator or its donor." 555 U.S. at 476. A vehicle owner may request the combination "YOLO" to express something about her life philosophy. But when the Department approves that personalized plate, it uses the combination to communicate something different—that the vehicle may be identified using that unique combination of

characters. And because the State communicates something with that combination too, it reviews applications to ensure that the combination is neither offensive nor contrary to the State's public policy.

The Eleventh Circuit's decision in *Mech v. School Board of Palm Beach County* is instructive in this regard. 806 F.3d 1070 (11th Cir. 2015). That case concerned a school district's program that allowed schools to "hang banners on their fences to recognize the sponsors of school programs." *Id.* at 1072. The banners included the business's name, phone number, web address, and logo. *Id.* at 1073. They "use[d] a uniform size, color, and font" and "include[d] a message thanking the sponsor." *Id.* at 1072. In concluding that the banners were government speech, the Eleventh Circuit explained that the government used the banners as a "way of saying 'thank you.'" *Id.* at 1077. "The fact that the sponsors may receive an incidental benefit from the [banners]—in the form of publicity and good will—[did] not refute" the distinct governmental purpose of the banners. *Id.* (quoting *Wells v. City & Cnty. of Denver*, 257 F.3d 1132, 1142 (10th Cir. 2001)).

Here, the alphanumeric combinations on personalized license plates are Tennessee's way of communicating identifying information about the vehicle to law enforcement and the public. Any incidental benefit to vehicle owners who choose personalized plates to express their own message does not refute this distinct government purpose.

In sum, both the general history of registration numbers on license plates and the specific history of Tennessee's personalized plates cut in favor of the State.

2.

We next consider the public's perception about who is speaking. The State argues that *Walker*'s reasoning about the public perception of license plates applies equally here. Gilliam disagrees and argues that the record in this case compels a different conclusion. We agree with the State.

*Walker* held that the public was likely to perceive Texas's specialty plate designs as government speech because "Texas license plates are, essentially, government IDs," and individuals who observe designs on IDs reasonably perceive them as conveying a message on behalf of the government issuer. 576 U.S. at 212. That reasoning applies equally to Tennessee's personalized license plates. They are "government article[s]," *id.*, that drivers are statutorily required to display on their vehicles and that must be returned to the government when revoked or no longer in use, *see* Tenn. Code Ann. §§ 55-4-212(a)(9), 55-5-119(a). As in *Walker*, "a person who displays a message on a [personalized Tennessee] license plate likely intends to convey to the public that the State has endorsed that message." 576 U.S. at 212. Otherwise, a bumper sticker would suffice. *Id.*

- 14 -

Gilliam attempts to distinguish *Walker* by pointing out that at least some of Texas's specialty plate designs were state-created, whereas here no personalized plate combinations are state-created. True enough. But the Supreme Court's analysis of public perception in *Walker* did not turn on that feature of Texas's program. To the contrary, *Walker* focused on the "governmental nature of the plates" themselves, not the governmental nature of the specialty designs on the plates. *Id.*

Gilliam also notes that Texas owned its specialty plate designs, including those proposed by private parties. *Walker* did mention Texas's ownership of the designs in evaluating how the public would perceive the specialty plates. *Id.* But that was only one of a laundry list of characteristics the Court considered. The crux of *Walker*'s analysis was its conclusion that license plates are, "essentially, government IDs." *Id.* Tennessee's personalized license plates share enough of the prominent features of Texas's specialty plates to warrant the same conclusion here. Although there is no evidence that Tennessee owns the alphanumeric combinations on personalized plates, Tennessee requires vehicle owners to surrender their personalized plates when they are no longer in use. *See* Tenn. Code Ann. § 55-4-212(a)(9). This surrender requirement confirms that personalized plates are "government article[s]" and not primarily a vehicle for individual expression. *Walker*, 576 U.S. at 212.

Gilliam also invokes common sense in arguing that the public attributes personalized alphanumeric combinations to the driver rather than the State. That argument is not without force. But the dissenting opinion in *Walker* made the same appeal to common sense, to no avail. 576 U.S. at 221–22 (Alito, J., dissenting). The dissent argued that it was highly unlikely that a member of the public would "assume that the State of Texas was officially (and perhaps treasonously) rooting for the Longhorns' opponents" upon seeing Texas license plates bearing the names of "Texas's out-of-state competitors." *Id.* at 222. Nevertheless, the *Walker* majority concluded that the public-perception factor weighed in the State's favor based on other reasons. *Id.* at 212–13 (majority opinion). And those other reasons apply equally here.

Finally, Gilliam argues that record differences require us to reach a different conclusion than *Walker*. Gilliam points to four pieces of evidence to support that argument: (1) Hudson's testimony as the Department's Rule 30.02(6) witness that Gilliam's personalized plate conveys "Ms. Gilliam's message, not the government's message"; (2) a state website stating that "[i]n Tennessee, license plates can be personalized with your own unique message"; (3) Scoville's testimony that his personalized plate conveys his own message, not the government's; and (4) the results of Secrest's survey regarding public perception.

None of this evidence materially distinguishes this case from *Walker*. At best for Gilliam, this evidence confirms the common-sense intuition that the public will attribute

the alphanumeric combination on a personalized plate at least in part to the vehicle owner. The same argument was made in *Walker*, but it did not carry the day. *See* 576 U.S. at 221–22 (Alito, J., dissenting).

Moreover, we are reluctant to place significant weight on Secrest's survey because methodological flaws limit its probative value. Secrest asked two hundred randomly selected Tennessee adults the following questions:

[1] As you may know, in Tennessee, license plates can be personalized with your own unique message. You can choose the letters or numbers yourself and submit an application for that personalized plate for the State of Tennessee, which may approve or deny it. Please tell me if you have ever applied for a personalized plate for yourself.

[2] When you see a personalized license plate that contains a combination of letters and numbers chosen by the car's owner, which of the following statements comes closer to your point of view? Statement A: The message featured on a personalized license plate represents the speech or views of the government or Statement B: The message featured on a personalized license plate represents the speech or views of the person who chose it.

Of those surveyed, eighty-seven percent responded that the message represents the speech or views of the person who chose it. Only four percent said the message is the government's speech, and nine percent were not sure. But survey participants were told in the first question that Tennessee's personalized license plates "can be personalized with your own unique message." That question may have biased the responses to the second question by predisposing participants to believe that the message expressed the views of the vehicle owner. And participants were presented with only two potential responses to the second question—personalized license plates are either government speech or the personal speech of the vehicle owner. Participants were not permitted to respond that personalized plates represent both government speech *and* personal speech.

More importantly, the survey does little to undercut *Walker*'s analysis regarding public perception. As explained, that analysis rested largely on the governmental nature of Texas's license plates and the fact that "a person who displays a message on a Texas license plate likely intends to convey to the public that the State has endorsed that message." *Walker*, 576 U.S. at 212. Even if the public understands Tennessee's personalized license plates to represent the speech of the vehicle owner, that does not preclude a conclusion that the plates also convey "government agreement with the message displayed." *Id.* at 213.

The fact that the alphanumeric combinations at issue here appear on government-issued license plates, moreover, distinguishes this case from *Tam*. As the Court explained

- 16 -

in *Tam*, *Walker*'s conclusion that "license plates 'are often closely identified in the public mind' with the State" stemmed from the fact that "they are manufactured and owned by the State, generally designed by the State, and serve as a form of 'government ID.'" *Tam*, 582 U.S. at 238 (quoting *Walker*, 576 U.S. at 212). None of those factors were present in *Tam*. To the contrary, it was "unlikely that more than a tiny fraction of the public ha[d] any idea what federal registration of a trademark means." *Id.* at 237. By contrast, nearly all those factors are present here.

Because we see no sound reason to reach a conclusion different from *Walker* regarding public perception, this factor also favors the State.

3.

Finally, we consider the extent to which the State has actively shaped or controlled expression through personalized plates. The State again argues that *Walker*'s analysis is controlling. Gilliam calls the State's position "nonsensical" and argues that "the Department's control over personalized plate messages" is loose at best.

We agree with the State that the level of control the Department exercises over Tennessee's personalized license plates is materially similar to the level of control Texas exercised over its specialty plates. *Walker* noted that Texas was required to approve specialty plate design proposals before they could appear on a Texas plate and that Texas had actively exercised that authority by rejecting "at least a dozen proposed designs." 576 U.S. at 213. The Department likewise has statutory authority to approve or deny applications for personalized plates and has actively exercised that authority by rejecting nearly one thousand requested combinations. Although the Department makes mistakes in its review process, it retains the authority to revoke personalized plates that are erroneously issued. *See* Tenn. Code Ann. § 55-5-117(a)(1).

Gilliam counters that the Department's "lax" process for reviewing applications has led to "wildly inconsistent results" that refute any notion that the State is carefully curating its message. But the dissenting opinion in *Walker* made a similar argument, noting that "Texas [did] not take care to approve only those proposed plates that convey messages that the State supports." 576 U.S. at 232 (Alito, J., dissenting). That was not enough to persuade the majority that Texas failed to exercise sufficient control over its specialty license plates.

Further, the level of control exerted over personalized license plates here is significantly greater than that exerted over the trademarks in *Tam* or the flags in *Shurtleff*. In *Tam*, trademark examiners could reject trademarks that were disparaging, but they did not "inquire whether any viewpoint conveyed by a mark is consistent with Government policy or whether any such viewpoint is consistent with that expressed by other marks already on the principal register." 582 U.S. at 235. Here, the Department is statutorily

prohibited from issuing "any license plate commemorating any practice which is contrary to the public policy of the state." Tenn. Code Ann. § 55-4-210(d)(1). And the Department has identified profanity, violence, sex, illegal substances, derogatory slang terms, and racial or ethnic slurs as objectionable categories.

The problem for Boston in *Shurtleff* was that it did not actively control the content of privately raised flags "at all." 596 U.S. at 256. Its practice was to "approve flag raisings, without exception." *Id.* at 257. It had "no written policies or clear internal guidance" regarding "what flags groups could fly and what those flags would communicate." *Id.* The city employee who handled applications did not "even see flags before the events," and the city "ha[d] no record of denying a request until Shurtleff's." *Id.* To be sure, the Department's process for reviewing personalized plate applications has room for improvement. But even the imperfect process currently employed is a far cry from the complete lack of control that existed in *Shurtleff*.

Accordingly, the control factor also favors the State.

C.

Applying the three factors that the United States Supreme Court has traditionally employed in its government speech precedents, we conclude that personalized alphanumeric combinations on Tennessee's license plates are government speech. *Walker* necessarily looms large in our analysis. We are mindful that *Walker* "likely marks the outer bounds of the government-speech doctrine" and that we must "exercise great caution before extending [the Court's] government-speech precedents." *Tam*, 582 U.S. at 235, 238. But we are not at liberty to overrule *Walker* or to distinguish it based on immaterial factual differences. The personalized plates "here in question are similar enough" to the specialty plates in *Walker* "to call for the same result." *Walker*, 576 U.S. at 213 (concluding that "the specialty plates here in question are similar enough to the monuments in *Summum* to call for the same result").

At bottom, most of the arguments that Gilliam and her amici raise are attacks on *Walker* itself. Those arguments would be more properly directed to the United States Supreme Court, which is the only court with authority to overrule or abrogate that precedent. Our job is to faithfully apply *Walker*'s reasoning to the facts of this case. *See, e.g.*, Bryan A. Garner et al*., The Law of Judicial Precedent* 27 (2016) (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996)). For the reasons explained above, the differences between Tennessee's personalized license plates and Texas's specialty licenses are not sufficiently material to cut us loose from that binding precedent.

We acknowledge that most of the courts that have considered whether personalized license plates are government speech after *Walker* have reached a contrary conclusion. *See*

*Mitchell v. Md. Motor Vehicle Admin.*, 148 A.3d 319, 325 (Md. 2016), *as corrected on reconsideration* (Dec. 6, 2016); *Overington v. Fisher*, 733 F. Supp. 3d 339, 343 (D. Del. 2024); *Ogilvie v. Gordon*, No. 20-cv-01707, 2020 WL 10963944, at *5 (N.D. Cal. July 8, 2020); *Carroll v. Craddock*, 494 F. Supp. 3d 158, 166 (D.R.I. 2020); *Hart v. Thomas*, 422 F. Supp. 3d 1227, 1233 (E.D. Ky. 2019); *Kotler v. Webb*, No. CV 19-2682, 2019 WL 4635168, at *8 (C.D. Cal. Aug. 29, 2019).

We disagree with those courts for two primary reasons. First, they failed to appreciate that the alphanumeric combinations on license plates are the government's way of communicating identifying information about the vehicle. *See, e.g.*, *Mitchell*, 148 A.3d at 326 (concluding that the history factor favored the plaintiff because "the State has not used vanity plates to communicate any message at all"); *Kotler*, 2019 WL 4635168, at *6 (concluding there was no "history of states using the *customized* registration number configurations to speak"); *Hart*, 422 F. Supp. 3d at 1232 (concluding that "license plate *numbers*, separate and distinct from license plate *designs*, have [not] historically been used to communicate messages from the State").

Second, they departed from *Walker* with respect to the control factor based on immaterial distinctions. In *Mitchell*, for example, Maryland's high court concluded that the State did not actively control the message on personalized plates even though it exercised final approval authority. 148 A.3d at 327. The court distinguished *Walker* on the ground that "Texas . . . had 'sole control' over the content of a specialty plate," whereas vehicle owners create the message on personalized plates. *Id.* But even in Texas's specialty plate program, private entities could submit draft designs for plates. *Walker*, 576 U.S. at 205. It was Texas's "final approval authority" over the designs that persuaded the Court in *Walker* that Texas maintained control over the messages on specialty plates. *Id.* at 213. And in *Kotler*, a federal district court concluded that California lacked effective control over its personalized plates notwithstanding that California had final approval authority; it did so based largely on the sheer number of personalized plates approved in California. *Kotler*, 2019 WL 4635168, at *7 (noting that California had approved hundreds of thousands of personalized plates). *Walker*, however, rejected the notion that the government speech analysis depends on "the precise number" of messages at issue. 576 U.S. at 217. Texas "allow[ed] many more license plate designs than the city in *Summum* allowed monuments." *Id.* But "Texas's desire to communicate numerous messages d[id] not mean that the messages conveyed [were] not Texas's own." *Id.* Still other courts erroneously concluded that the State's control over personalized plates was more akin to the level of control exerted in *Tam* than in *Walker*. *See Overington*, 733 F. Supp. 3d at 346; *Ogilvie*, 2020 WL 10963944, at *5. In reality, the facts in these cases were much more similar to *Walker*.

Other courts have concluded, after *Walker*, that personalized plates are government speech. *See Comm'r of Ind. Bureau of Motor Vehicles v. Vawter*, 45 N.E.3d 1200, 1204–05 (Ind. 2015); *Odquina v. City & Cnty. of Honolulu*, No. 22-cv-407, 2022 WL 16715714,

- 19 -

at *9 (D. Haw. Nov. 4, 2022), *aff'd on other grounds*, No. 22-16844, 2023 WL 4234232 (9th Cir. June 28, 2023). Like us, those courts found that "alphanumeric combinations provide identifiers for public, law enforcement, and administrative purposes" and therefore have historically been used to convey government speech. *Vawter*, 45 N.E.3d at 1204; *Odquina*, 2022 WL 16715714, at *9 (concluding that the "[a]lphanumerics on Hawaiʻi's license plates . . . enable members of the public, law enforcement, and administrative officers to identify vehicles"). Also like us, those courts found that the government exerted effective control over personalized license plates because it had final approval authority and actively exercised that authority by reviewing and, at times, rejecting requested combinations. *Vawter*, 45 N.E.3d at 1206; *Odquina*, 2022 WL 16715714, at *10–11.

We find the reasoning of *Vawter* and *Odquina* persuasive and agree with those courts that the alphanumeric combinations on personalized license plates constitute government speech under *Walker*.

## CONCLUSION

Under a faithful application of *Walker* and other applicable United States Supreme Court precedents, the alphanumeric combinations on Tennessee's personalized license plates are government speech. The Court of Appeals erred by holding otherwise. We therefore reverse that decision and reinstate the trial court's judgment in favor of the State.

_____
SARAH K. CAMPBELL, JUSTICE

- 20 -